995 So.2d 799 (2008)
William NELSON, III a/k/a Billy Nelson, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2007-KA-01048-COA.
Court of Appeals of Mississippi.
May 20, 2008.
Rehearing Denied September 30, 2008.
Certiorari Denied December 4, 2008.
*801 George T. Holmes, Jackson, attorney for appellant.
Office of the Attorney General by Ladonna C. Holland, attorney for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. This is an appeal from the capital murder conviction of William Nelson, III following his trial in the Circuit Court of Jackson County. Subsequent to the denial of his motion for a new trial or judgment notwithstanding the verdict (JNOV), Nelson appealed his case to the supreme court, and it was deflected here. On appeal, Nelson claims that: (1) there was insufficient evidence to demonstrate that he was guilty of capital murder; (2) the trial court erred in failing to exclude bad character evidence; (3) the trial court erred in not allowing Nelson's expert witness to testify; and (4) the trial court erred in refusing to grant defense jury instruction D-16.
¶ 2. Finding no error, we affirm.

PROCEDURAL HISTORY
¶ 3. In August 2006, Nelson was indicted for capital murder pursuant to of Mississippi Code Annotated section 97-3-19(2)(e) (Rev.2006) while in the commission of a robbery pursuant to Mississippi Code Annotated section 97-3-73 (Rev.2006). Following a trial on the matter in the Circuit Court of Jackson County, he was convicted of capital murder and sentenced to life without parole in the custody of the Mississippi Department of Corrections. Nelson neither testified in his defense, nor were any witnesses presented to the jury on his behalf.[1] Nelson filed a motion for a new trial or, alternatively, a JNOV. However, his post-trial motions were denied. From this denial, Nelson now appeals.

FACTS
¶ 4. There was testimony during trial indicating that the victim in this case, Willie Martin Broughton, was a drug dealer. As a result of Hurricane Katrina, Broughton, Keisha Bolton, and others were living with Arthurene Pittman (Pittman) in her home. As a result of Bolton's proximity to Broughton, she, Nelson, and Earnest Covan had been stealing drugs from Broughton for an unspecified amount of time. On December 8, 2005, Nelson received the signal that Bolton had successfully stolen additional drugs from Broughton, and Nelson was to go pick up the drugs from Pittman's home.
¶ 5. Once Nelson arrived, Covan gave him a shotgun in case anything went wrong. The trio were afraid Broughton had learned of the thievery. Nelson hid the weapon in his pants. He claimed in his statement to the police that Bolton then gave him a pill bottle that she had stolen from Broughton containing crack cocaine. Later, Broughton confronted Nelson about an unrelated matter.[2] Nelson drew his weapon and told Broughton *802 that he would kill him. In response, Broughton said, "shoot me." Nelson pulled the shotgun's hammer back and shot Broughton.[3] However, Nelson claimed that the gun discharged accidently.
¶ 6. At this point, the evidence diverged. Nelson, through his statement given to the police, claimed that after shooting Broughton, he pointed the shotgun at Bolton and told her to get the rest of Broughton's drugs. When she returned she gave Nelson a pouch that contained an unidentified narcotic. Nelson claimed that he dropped the pouch and fled the scene. However, Pittman testified that after shooting Broughton, Nelson knelt down, rolled Broughton over, and retrieved a pill bottle.
¶ 7. Soon after the murder, Nelson turned himself in to the authorities. During a search incident to arrest, a small amount of crack cocaine was found on Nelson's person. During an interview, Nelson admitted that the crack cocaine found on him was a portion of the same crack cocaine he had stolen from Broughton. Additionally, Nelson led law enforcement to where he hid the clothes he was wearing the night of the murder, as well as the remaining crack cocaine stolen from Broughton.
¶ 8. Additional facts will be discussed below as needed.

ANALYSIS

I. WHETHER THE TRIAL COURT ERRED IN DENYING NELSON'S MOTIONS FOR A DIRECTED VERDICT OR JNOV.
¶ 9. At the close of the State's case-in-chief, Nelson moved for a directed verdict. Additionally, after the jury returned its verdict, Nelson similarly made a post-trial motion for a JNOV. The trial court denied Nelson's motions at both stages of the trial, and Nelson argues that the trial court's denials were made in error.
¶ 10. Motions for directed verdict and JNOV challenge the sufficiency of the evidence, and the standard of review of denials of such motions is the same. Parks v. State, 884 So.2d 738, 743(¶ 15) (Miss.2004). Specifically, this Court's standard of review when the legal sufficiency of the evidence is challenged is as follows:
[This Court] must, with respect to each element of the offense, consider all of the evidencenot just the evidence which supports the case for the prosecutionin the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. [This Court] may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.
Spicer v. State, 921 So.2d 292, 311(¶ 38) (Miss.2006) (quoting Franklin v. State, 676 So.2d 287, 288 (Miss.1996)).
¶ 11. Nelson was found guilty of capital murder in violation of Mississippi Code Annotated section 97-3-19(2)(e), which states, in pertinent part, that:
(2) The killing of a human being without the authority of law by any means or in *803 any manner shall be capital murder in the following cases:
....
(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of ... robbery ... or in any attempt to commit such felon[y].
Robbery is defined as the "[felonious] tak[ing] [of] the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person...." Miss.Code Ann. § 97-3-73. Nelson argues that no robbery occurred at the time Broughton was shot and killed, and therefore, the evidence was insufficient to support the charge of capital murder.
¶ 12. In support of his claim, Nelson cites to Clayton v. State, 759 So.2d 1169 (Miss. 1999). In Clayton, Lauree Lott Gray was walking through the parking lot of a grocery store when Clayton approached her from behind and took her purse. Id. at 1170(¶ 2). Clayton was subsequently tried and convicted of robbery. Id. at (¶ 4). However, the indictment upon which Clayton's conviction rested narrowed the language of section 97-3-73 and only charged that Clayton took the purse by putting Lott in fear of harm. Id. at 1171(¶ 7). The supreme court reversed his conviction holding that the proof did not show Clayton obtained the purse by putting Lott in fear of harm, but by force. Id. at 1173(¶ 13).
¶ 13. In this case, no such distinction can be made. Unlike the indictment against Clayton, the indictment against Nelson did not limit its scope by how the theft took place. Therefore, Clayton is not applicable.
¶ 14. The evidence in the record shows that Nelson and Bolton had a system in place by which they collectively stole Broughton's drugs. Nelson would call Pittman's house with the understanding that if Bolton hung up the telephone it meant that she had stolen more of Broughton's drugs, and Nelson could come pick them up. On the night of December 8, 2005, Nelson called Pittman's house, and Bolton, presumably, hung up the telephone. Nelson and Covan proceeded to go to Pittman's house with the intention of retrieving the stolen narcotics. On the way to the house, Covan told Nelson that he had "something" for him at Pittman's house that he could use to protect himself in case anything went wrong.[4]
¶ 15. Once Nelson and Covan arrived at Pittman's house, Covan gave a sawed-off shotgun to Nelson, and Nelson hid the weapon in his pants. Nelson claimed that Bolton gave him a pill bottle with approximately two ounces of crack cocaine in it. However, Nelson also stated that when he left Pittman's house he had a total of approximately four ounces of crack cocaine from Bolton. Subsequent to retrieving the narcotics from Bolton, Broughton confronted Nelson about an unrelated matter. Nelson, who was admittedly under the effects of drugs during the entire altercation, stated that he and Broughton exchanged words with each other, and Broughton "made a move." At this point, Nelson pulled out the shotgun and pointed it at Broughton. Glady Pittman, Pittman's *804 granddaughter, testified that Nelson told Broughton that he would kill him. In defiance, Broughton brazenly told Nelson to shoot him. Nelson pulled the shotgun's hammer back; the weapon discharged; and Broughton was struck in the stomach. Broughton later died of his wounds.
¶ 16. In his statement to law enforcement, Nelson claimed that he then pointed the shotgun at Bolton and demanded that she give him all the narcotics that Broughton had. Bolton complied, and she gave him a pouch that Nelson assumed had drugs in it. Nelson claimed that he was so scared at this point that he dropped the pouch and ran out of the house. However, Glady testified that after Nelson shot Broughton, Nelson rolled him over and picked up a pill bottle. During cross-examination, she reiterated her previous testimony, although without the same conviction. When defense counsel asked if Nelson took any money, she responded as follows:
A. I didn't see him take no money. I think I saw him reach down and get a pill bottle. That's all I saw.
Q. Grabbed the pill bottle off the floor or whatever? You don't know for sure.
A. When I saw the blood, I was through. I was gone.
¶ 17. "An indictment charging a killing occurring `while engaged in the commission of [robbery]' includes the actions of the defendant leading up to the [robbery], the attempted [robbery], and flight from the scene of the [robbery]." Knox v. State, 805 So.2d 527, 531(¶ 14) (Miss.2002) (quoting West v. State, 553 So.2d 8, 13 (Miss.1989)). During his statement to the police, Nelson admitted that he went to Pittman's house with the intention of stealing Broughton's personal property. Nelson admitted to shooting Broughton. He also admitted that the crack cocaine found on his person when he was arrested and the crack cocaine to which he led law enforcement were stolen from Broughton. The only dispute is how he came into possession of the crack cocaine. Although Nelson claims differently, Glady testified that after shooting Broughton, Nelson rolled Broughton over and picked up a pill bottle. As this Court has often stated, witness credibility is solely for the jury to decide. Spicer, 921 So.2d at 312(¶ 40). Accordingly, we find that there was legally sufficient evidence to convict Nelson of capital murder. This issue is without merit.

II. WHETHER THE TRIAL COURT ERRED IN ADMITTING A PORTION OF NELSON'S TAPED STATEMENTS.
¶ 18. Nelson next argues that the trial court erred by not directing the State to redact the following underlined portion from Nelson's statement given to law enforcement.
McClenic: So a vice lord is beating up on a G Queen? Is that like total disrespect to the gangsters?
Nelson: Not if she put herself out there like that for it, for him to do that, not if she give herself to him [sic]. See it's a difference between being in the penitentiary and being involved in [an] organization and being out on the streets and involved in an organization. If you out [sic] on the streets the same rules don't apply for being in the penitentiary cause you out [sic] on the street you doing your own thing out there. You ain't obligated to noone [sic] out there on the street[,] but in the penitentiary you obligated to be your brother's keeper. *805 See when you a[sic] gangster and you're out there on the street and you ain't got your fellow gangster brothers helping you with your habit, helping you with your money and helping you just financially[,] then you ain't got to be obligated[,] and I ain't have nobody helping me do nothing out there so I wasn't obligated to none of them gangs [sic] out there on the street.
Nelson argues that allowing the statement to be presented to the jury amounted to a violation of Mississippi Rule of Evidence 404(b) as "the jury would probably infer that Nelson was speaking from first-hand knowledge gained from being in prison," and the trial court was required to perform a Mississippi Rule of Evidence 403 balancing test.
¶ 19. The standard of review governing the admissibility of evidence is abuse of discretion. Brown v. State, 969 So.2d 855, 860(¶ 13) (Miss.2007). Unless the trial court does indeed abuse this discretion so as to prejudice the defendant, this Court will not reverse its ruling. Id. (quoting Shaw v. State, 915 So.2d 442, 445(¶ 8) (Miss.2005)).
¶ 20. Rule 404(b) provides as follows:
Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
The trial court reasoned that the statement was admissible as "it [did not] say [Nelson was] in the penitentiary, nor [did] it say where [Nelson] got his knowledge." The supreme court has stated that the purpose of Rule 404(b) "is to prevent the State from raising the inference that the accused has committed other crimes and is therefore likely to be guilty of the offense charged." White v. State, 842 So.2d 565, 573(¶ 24) (Miss.2003). We find that the above statement does not imply that Nelson had spent time in a penitentiary, and thus, it does not violate Rule 404(b). It is neither evidence of a prior crime, wrong, or act, nor could it be construed as admitted to prove Nelson's character or acting in conformity therewith. This issue is without merit.

III. WHETHER THE TRIAL COURT ERRED BY NOT QUALIFYING NELSON'S PROFFERED FIREARMS EXPERT.
¶ 21. Nelson claimed in his statement to law enforcement that the shotgun accidently discharged. Such was the cornerstone of Nelson's defense. In support of this position, James Bowman was offered as an expert in firearms, Bowman testified outside the presence of the jury. When asked about his experience with firearms Bowman testified that: (1) he had an undergraduate degree in criminal justice; (2) he was previously in the United States Navy and was a Navy SEAL; (3) he completed three tours of duty in Vietnam; (4) while in Vietnam, he trained various individuals in, among other things, firearms; (5) he was a graduate of the San Diego Police Academy; (6) he was a member of the Pascagoula Police Department; (7) he attended two FBI SWAT schools and a FBI sniper school; and (8) when he was younger, he used to hunt with his father's shotgun. Although the shotgun used in the killing was never recovered, Bowman testified that he tested various shotguns under the presumptions gleaned from the evidence. Namely, that the shotgun was probably a 12-gauge, single-barrel *806 shotgun. He stated that he conducted tests with four different 12-gauge, single-barrel shotguns. According to Bowman, none of the tests of the three newer models of shotguns resulted in an accidental discharge. However, the fourth shotgun, a pre-1960 model, consistently fired without having to pull the trigger.
¶ 22. Nelson argues that the trial court erred in not allowing Bowman to testify. Nelson claims that the trial court's ruling was based upon credibility rather than its role as "gatekeeper." Additionally, Nelson claims the trial court's ruling precluded him from presenting evidence of his theory of the case; namely, that it was an accident. Nelson cites Amacker v. State, 676 So.2d 909 (Miss.1996) and Terry v. State, 718 So.2d 1115 (Miss.1998) in support of his claim.
¶ 23. In Amacker, the trial court struck the testimony of two children as effectively incompetent as they could not remember the day the incident-at-issue occurred. Amacker, 676 So.2d at 912. The supreme court reversed the trial court and held that the fact that the children could not remember the specific date went to the issue of credibility rather than their incompetency to testify. Id. at 913. In Terry, the defendant, on trial for embezzlement, wanted to present evidence that would show that other employees, including the business owners, were possible suspects for taking the money. Terry, 718 So.2d at 1121(¶ 29). The supreme court reversed the trial court's ruling that excluded the evidence and held that the defendant "should have been allowed to present evidence that would prove her theories of innocence." Id. at 1123(¶ 37). We find neither Amacker nor Terry to be instructive on the issue now before this Court. In both cases, the trial court was faced with witnesses who had direct, first-hand knowledge of issues directly relevant to its particular case. Such was not the case here.
¶ 24. It is within the sound discretion of the trial court whether to allow expert testimony. Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 34(¶ 4) (Miss. 2003). Its decision will not be disturbed unless this Court finds "that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion." Id. (citation omitted). It is certainly a correct statement of law that defendants have a fundamental right to present his or her theory of the case to the jury. Chinn v. State, 958 So.2d 1223, 1225(¶ 13) (Miss. 2007). However, a trial court is not required to allow a proffered expert to testify solely because such testimony goes to a defendant's theory of the case. Turner v. State, 726 So.2d 117, 130(¶ 51) (Miss.1998). Mississippi Rule of Evidence 702 charges the trial court with the role of "gatekeeper" in determining whether an expert's testimony is both relevant and reliable prior to allowing it to be presented to a jury. M.R.E. 702 cmt.; Giannaris v. Giannaris, 960 So.2d 462, 469-70(¶ 14) (Miss.2007).
¶ 25. Before ruling on the issue, the trial court asked Bowman two questions. First, the trial court asked whether Bowman believed the murder weapon could have been another gauge. Second, the trial court asked if the standard of care in the manufacture of shotguns varied based upon the nation in which the weapon was made. Bowman responded "yes" to both inquires. Subsequently, the trial court ruled as follows:
The Court has before it a Daubert issue as to allowing certain testimony to go before the jury with respect to, first of all, whether Mr. Bowman is a firearms expert; two, whether the particular tape to be introduced, will aid the jury in the defendant's theory of the case. The Court is not unmindful that it is a theory *807 of the defense that this was an accident. The Court is not unmindful that it is a capital murder case and it is a serious charge. However, the Courts are charged by the U.S. Supreme Court and our Supreme Court, as being the gatekeepers... as to the type of information that comes before a jury, and the tests are many. But it looks for expertise and it looks for reliability.
In this particular case, a shotgun killed Willie [Martin] Broughton. The shotgun was not recovered. We have, in the evidence, something about a hammer. We have purported lengths shown by the hands of witnesses, that may have been 12 inches, may have been, in my view from where I sat, 16 to 18 inches. There is no evidence in the record of the make, model[,] or type of shotgun this is. There is nothing in evidence that shows [the] Court it was a single barrel, double barrel, et cetera. There is no doubt that Mr. Bowman has had training in firearms and has taught individuals across the spectrum, from police officers to repatriated Viet Kong, to soldiers in Vietnam; but I find nothing in his Curriculum Vitae or in his background [sic]. There are no writings, there are no other tests, there are no other publications, et cetera, that show him to have special knowledge about shotguns in general, except that years ago he used his father's shotgun to hunt across the river. I find that whatever he would offer by way of this tape, would not be reliable, would not be probative, and therefore I'm going to disallow his testimony....
¶ 26. Although it is clear that Bowman had vast experience with military and police training, we find the trial court did not abuse its discretion in not allowing Bowman to testify. There simply was not enough information available about the particular shotgun used by Nelson to provide the necessary relevancy and reliability for Bowman's expert testimony. The testimony revealed that the only information conclusively known about the shotgun was that it was, indeed, a shotgun. There was testimony that it could have been a 12-gauge shotgun, but this was circumstantial. Additionally, Bowman himself informed the trial court that it could have been a different gauge. However, as the trial court identified, there was no testimony as to the make, model, type, age, or country of manufacture of the shotgun used by Nelson.
¶ 27. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. In this case, while Bowman conducted his test under the parameters set out by defense counsel, it was based upon incomplete, and possibly inaccurate, information. Therefore, Bowman's testimony and the results of his test could not have offered anything that would have assisted the jury in reaching its verdict. This issue is without merit.

IV. WHETHER THE TRIAL COURT ERRED IN REFUSING JURY INSTRUCTION D-16.
¶ 28. Nelson argues that the trial court erred in denying the defense's jury instruction D-16, which stated, "[t]he Court instructs the Jury that the killing of any human being by the act, procurement, or omission of another shall be excusable when committed by accident and misfortune, in the heat of passion, upon a sudden and sufficient provocation." Nelson claims that as a result of the trial court's ruling, he was not allowed to present his theory of the case to the jury.
¶ 29. This Court's standard of review when the grant or denial of a jury *808 instruction is at issue has been stated as follows:
Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
Chandler v. State, 946 So.2d 355, 360(¶ 21) (Miss.2006) (citations omitted) (emphasis added). Prior to refusing instruction D-16, the trial court granted the State's jury instruction S-9. It stated that:
The Court instructs the jury that, under Mississippi law, an accident or misfortune [cannot] be a defense to the charge of capital murder committed during the course of a robbery. If you find the defendant not guilty of capital murder, and consider a lesser[-]included offense, such as murder or manslaughter, then you should consider accident or misfortune, as stated in other instructions.
We find that the State's jury instruction S-9 was a correct statement of the law, and the defense's jury instruction D-16 was an incorrect statement of the law under the facts presented in this case. When faced with the charge of capital murder, a defendant is not entitled to raise the defense of accident as to that charge. See Griffin v. State, 557 So.2d 542, 549 (Miss. 1990) ("There is nothing about [Mississippi Code Annotated section 97-3-19(2)(e)] which requires any intent to kill when a person is slain during the course of a robbery. It is no legal defense to claim accident, or that it was done without malice."). Therefore, Nelson's application of the defense of accident to any "killing of a human being" was simply not correct. Additionally, the defense of accident was accurately covered under the State's jury instruction S-9. This issue is without merit.
¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] Although Nelson did not testify at trial, his statement was taken during an interview with law enforcement. This statement was subsequently admitted into evidence.
[2] The record shows that the altercation began when Broughton asked Nelson why he did not close the door when he came inside Pittman's house.
[3] Broughton did not immediately die. Lee Leonard, who was a deputy sheriff with the Jackson County Sheriff's Department at the time of the shooting, testified that Broughton was still alive when he arrived at Pittman's home shortly after 911 was called.
[4] The evidence showed that Nelson and Bolton were in a previous relationship, and they were possibly still seeing each other at the time of the shooting. Also, the evidence showed that Bolton was also in a relationship with Broughton. Nelson claimed in his statement to the police that Broughton had assaulted Bolton on numerous occasions. Nelson believed it was because Broughton found out Bolton was stealing drugs for Nelson. Additionally, Nelson and Broughton were members of rival gangs.