PER CURIAM.
 

 Randy Schoenwetter appeals a circuit court order denying his motion to vacate his convictions of first-degree murder and sentences of death, filed pursuant to Florida Rule of Criminal Procedure 3.851. He also petitions this Court for a writ of habe-as corpus. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const. Having considered the issues raised in the briefs and having heard oral argument, we now affirm the circuit court’s order and deny the petition for writ of habeas corpus.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 Appellant’s case was previously heard by this Court on direct appeal from his
 
 *541
 
 conviction and sentencing in the circuit court.
 
 See Schoenwetter v. State,
 
 931 So.2d 857 (Fla.2006). In our opinion affirming appellant’s conviction and death sentences, we described the facts of the underlying offenses as follows:
 

 At the time of the crimes, the Friskey family consisted of five people: the father, Ronald; the mother, Haesun; and the three children, Chad (eighteen years old), Theresa (sixteen years old) and Virginia, (ten years old). The defendant had known the Friskey family from childhood and attended the same karate school with the Friskey children. He was friends with Chad until Chad left for the Air Force a few months before the crime. Throughout his association with the family and before the crimes occurred, the defendant stayed overnight at the Friskey residence on a number of occasions.
 

 [[Image here]]
 

 At approximately 3 a.m. on August 12, 2000, the defendant left his apartment, where he lived with his mother. He rode his bicycle to the Krystal’s Restaurant, where he was employed. After staying at Krystal’s for a short time, he left on his bicycle and rode to the Fris-key residence. According to the defendant’s letter to the court confessing guilt, he decided to go to the Friskey residence so that he could force one of the Friskey daughters, Theresa, age sixteen, or Virginia, age ten, to have sex with him.
 

 Schoenwetter arrived at the Friskey residence at approximately 5 a.m. He parked his bicycle on the back driveway of the residence and walked up to the back porch. He used a box cutter to cut open the screen and enter the porch. He then managed to push open the sliding glass door from the porch into the house just enough to slip through. There was a stick in the sliding door which only allowed the door to be opened twelve inches. After entering the house, he walked directly into the kitchen and armed himself with a large serrated kitchen knife from one of the drawers. He then walked down the hallway where the three bedrooms were located.
 

 The first door he approached was to Theresa’s bedroom; it was locked. He then peeked inside the bedroom on the opposite side of the hall and saw the parents asleep in their bed. He knew, based upon his previous overnight visits to the Friskey home, that the parents were heavy sleepers. He then entered Virginia’s bedroom, which was directly across the hall from the parents’ bedroom and next to Theresa’s bedroom.
 

 During his taped confession, Schoen-wetter said he entered Virginia’s room and began looking around. He said he never touched her body. While he was in her room, Virginia woke up and began to shriek. He put his hand over her mouth, threatened her with a knife, and told her to be quiet. She continued to shriek, she then recognized him, and said his name, Randy. He started to leave the room, but the mother came into the room and grabbed him. The father came into the room and tackled him. After struggling with the parents for a short time, he managed to break loose. Instead of leaving the house, he decided to go back to Virginia’s bed and kill her because she had recognized him and could identify him. He stabbed her on her bed. After he stabbed her, the father tackled him. He then struggled with both parents until he managed to break loose again. The defendant then left the house the same way he came in, got on his bike, and rode home. After he arrived home, he took a shower, placed his clothes, shoes, the box cutter, and the knife inside a blue plastic bag,
 
 *542
 
 placed the blue bag inside a trash bag containing trash from his apartment, and put the trash bag in the dumpster.
 

 Id.
 
 at 862-63. Regarding the injuries suffered by the victims, we stated:
 

 The forensic evidence revealed Ronald Friskey died as a result of multiple stab wounds, including a stab wound to the eyebrow, forehead, left upper back, left middle back, middle back close to the spine, right lower back, right side of the neck, and three wounds to the right side of the chest. Ronald Friskey also had wounds on his right hand, which were consistent with defensive wounds. The wounds to the right side of the neck and the left middle back were life-threatening wounds, because they were very deep and caused extreme blood loss. The wound to the left middle back penetrated Ronald Friskey’s lung.
 

 It was determined that Virginia Fris-key also died as a result of multiple stab wounds. One stab wound was inflicted to each side of her chest. The stab wound on the left was four inches deep and the one on the right was three inches deep. She also had a wound on each hand which entered the back of the hand and came out to the front of the hand. It appears that she was shielding her chest and that these wounds occurred at the same time as the chest wounds. The wounds to her chest penetrated her heart and both lungs. She also had wounds to her lip and to her lower jaw.
 

 Haesun Friskey was stabbed multiple times but survived. She was in critical condition when she arrived at the hospital and had to undergo surgery to stop the bleeding in her liver and the bleeding on two parts of her arm. She suffered from massive blood loss and received 100 units of blood during her hospital stay. Dr. Emran Imani, the trauma surgeon who treated Haesun Friskey, testified that this was the equivalent of replacing her entire blood volume more than twenty times. He described her survival as miraculous, stating that she was expected to die when she arrived at the hospital.
 

 Id.
 
 at 864.
 

 The morning after the incident, law enforcement officers encountered the appellant after following a trail of blood which led from the Friskey residence to the apartment complex where Schoenwetter lived with his mother. Schoenwetter agreed to accompany two detectives to the police station for an interview, which was videotaped. Although he initially denied any involvement, Schoenwetter subsequently confessed to the crimes and gave a detailed statement to the officers.
 
 See id.
 
 at 863-64. This statement was corroborated by blood DNA testing based on samples taken from Schoenwetter’s clothes, Virginia Friskey’s bedroom, and other items and locations. The blood trail leading from the Friskey residence was determined to match Schoenwetter’s blood DNA, which was also found on the handle of the knife used against the victims.
 
 See id.
 
 at 864.
 

 Schoenwetter was indicted on August 29, 2000, for first-degree murder in the death of Virginia Friskey, first-degree murder in the death of Ronald Friskey, attempted first-degree murder of Haesun Friskey, and armed burglary of a dwelling.
 
 See id.
 
 at 861. On February 17, 2003, Schoenwetter wrote a letter to the trial judge confessing his guilt and indicating that he wished to change his plea from not guilty to guilty. He also stated that his reason for entering the residence was to force one or both of the Friskey daughters to have sex with him. A status hearing was held on February 26, 2003. Against the advice of counsel to remain silent, and
 
 *543
 
 after a cautionary instruction by the trial judge, Sehoenwetter admitted to the court that he had written the letter and expressed his desire to change his plea to guilty. A guilty plea to all charges was entered on March 5, 2003.
 

 Penalty phase proceedings were held from September 15 through September 25, 2003. At the end of the proceedings, the jury recommended death for the murder of Virginia Friskey by a vote of ten to two, and for the murder of Ronald Friskey by a vote of nine to three. The court held a Spencer
 
 [1]
 
 hearing on November 7, 2003, and subsequently imposed a sentence of death for each first-degree murder charge and sentences of life in prison for the attempted murder and armed burglary charges. The court found three aggravating circumstances to be applicable to both murders: (1) the defendant had been convicted of another capital offense or of a felony involving the use or threat of violence to some person; (2) the crime for which the defendant was to be sentenced was committed while he was engaged in the commission of or the attempt to commit the crime of burglary; and (3) the crime was committed for the purpose of avoiding or preventing a lawful arrest. As to the murder of Virginia Friskey, the court also found the aggravating circumstance that the victim was a person of less than twelve years of age. As to the murder of Ronald Friskey, the court found that the crime was especially heinous, atrocious or cruel (HAC).
 

 The trial court considered and assigned weight to the following statutory mitigating circumstances: (1) lack of prior criminal history (little weight); (2) extreme mental or emotional disturbance (little weight);
 
 [2]
 
 (3) lack of capacity to conform conduct to the requirements of the law (little weight);
 
 [3]
 
 and (4) the defendant’s age (eighteen) at the time of the crime (little weight). The court also considered and weighed eight of the nine nonstatutory mitigators proposed by Sehoenwetter: (1) defendant accepted responsibility by pleading guilty (moderate weight); (2) defendant was bullied by his peers from an early age (little weight); (3) defendant was continuously employed as a teenager and helped his mother financially (no weight); (4) defendant will not pose a danger to the prison population if given life without parole (little weight); (5) defendant’s ability to interact socially is impaired due to As-perger’s Syndrome and ADHD (little weight); (6) defendant had a sexual preoc
 
 *544
 
 cupation from the age of seven (little weight); (7) defendant had a developmental and emotional age of twelve to thirteen at the time of the offense (not proven by the greater weight of the evidence);
 
 [4]
 
 (8) defendant had a close loving relationship with his mother and his younger sister (no weight); (9) while in the tenth grade, defendant was physically and emotionally abused by his mother’s boyfriend (little weight). Finally, the court determined that each of the aggravating factors, standing alone, was sufficient to outweigh all of the mitigating circumstances combined.
 

 On direct appeal to this Court, Schoen-wetter raised nine issues. He argued that the trial court had erred in (1) denying his attorneys’ pretrial motion to suppress the confession and fruits thereof; (2) admitting certain victim impact evidence and denying defense counsel’s motion to withdraw; (3) allowing a medical examiner who did not perform the victims’ autopsies to testify as to his opinion regarding the cause and manner of death; (4) denying his motion for mistrial based on the claim that the prosecutor deliberately misled the jury about the defendant’s lack of a significant criminal history; (5) denying his motion to disqualify the trial judge; (6) admitting inflammatory photographs of the victims’ wounds; and (7) finding improper aggravating circumstances, failing to consider relevant mitigating circumstances, and incorrectly finding that the aggravating factors outweighed the mitigating factors. Schoenwetter also argued (8) that the standard jury instructions unconstitutionally placed the burden of proof on the defendant, and (9) that section 921.141, Florida Statutes, was unconstitutional for allowing the trial court to impose a death sentence without a unanimous jury verdict. We rejected each claim and affirmed the judgment and sentences imposed by the trial court.
 
 See Schoenwetter,
 
 931 So.2d at 866-77. Certiorari was denied by the United States Supreme Court on November 13, 2006.
 
 See Schoenwetter v. Florida,
 
 549 U.S. 1035, 127 S.Ct. 587, 166 L.Ed.2d 437 (2006).
 

 Schoenwetter filed a motion for postcon-viction relief pursuant to Florida Rule of Criminal Procedure 3.851 in the circuit court on October 30, 2007, raising six general claims.
 
 [5]
 
 In its March 26, 2008, order
 
 *545
 
 on the motion, the circuit court granted an evidentiary hearing as to Schoenwetter’s claims of ineffective assistance of counsel during the penalty phase but denied a hearing on the remaining claims. More than a dozen witnesses testified at the evidentiary hearing, including Schoenwet-ter’s trial attorneys. After the hearing, the circuit court entered an order denying relief on each claim.
 

 Schoenwetter now appeals the circuit court’s denial of his motion for postconviction relief. Corresponding with the arguments raised in the motion filed below, he argues: (1) denial of the effective assistance of counsel during pretrial proceedings; (2) the trial court erred in denying an evidentiary hearing on whether Florida’s lethal injection procedure is unconstitutional and in failing to grant relief on the claim; (3) denial of the effective assistance of counsel during the penalty phase; (4) his death sentence is unconstitutional in light of
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); and (5) the cumulative impact of all constitutional error renders the death sentence unconstitutional. In an accompanying petition for writ of habeas corpus, Schoen-wetter contends, first, that his death sentence is unconstitutional in light of the principles announced in
 
 Roper
 
 and in
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and second, that he was denied the effective assistance of appellate counsel.
 

 II. RULE 3.851 CLAIMS
 

 A. Ineffective Assistance of Counsel During Pretrial Proceedings
 

 Appellant first argues that his trial counsel was ineffective during pretrial proceedings for failing to move to exclude from the penalty phase: (a) statements made at the February 26, 2003, status hearing; (b) statements made at the March 5, 2003, plea colloquy; and (c) his letter to the trial judge confessing guilt. Appellant asserts that trial counsel should have moved to have these statements excluded under section 90.410, Florida Statutes (2003), and Florida Rule of Criminal Procedure 3.172, which prohibit the use of statements made during the course of plea negotiations. He also contends that counsel should have moved to suppress the statements made at the status hearing and plea colloquy as having been obtained in violation of
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 Following the United States Supreme Court’s decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
 

 
 *546
 
 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted). Where this Court has previously rejected a substantive claim on the merits, counsel cannot be deemed ineffective for failing to make a meritless argument.
 
 See Melendez v. State,
 
 612 So.2d 1366, 1369 (Fla.1992),
 
 receded from on other grounds by Deren v. State,
 
 985 So.2d 1087, 1088 (Fla.2008). Because both prongs of the
 
 Strickland
 
 test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004).
 

 1. Failure to Object to Statements as Made in Connection With an Offer to Plead Guilty
 

 Appellant first asserts that counsel was deficient for failing to object to the admission of both the confession letter and his in-court admissions made during pretrial proceedings on the grounds that they were made in connection with an offer to plead guilty. Section 90.410, Florida Statutes, provides:
 

 Evidence of a plea of guilty, later withdrawn; a plea of nolo contendere; or an offer to plead guilty or nolo contendere to the crime charged or any other crime is inadmissible in any civil or criminal proceeding. Evidence of statements made in connection with any of the pleas or offers is inadmissible, except when such statements are offered in a prosecution under chapter 837.
 

 See also
 
 Fla. R.Crim. P. 3.172(i).
 
 [6]
 
 In order to prove deficiency under
 
 Strickland,
 
 appellant must first show that trial counsel’s failure to object on these grounds was outside the broad range of reasonably competent performance under prevailing professional standards.
 
 See Maxwell,
 
 490 So.2d at 932. Clearly, “[cjounsel cannot be deemed ineffective for failing to make a meritless objection.”
 
 Hitchcock v. State,
 
 991 So.2d 337, 361 (Fla.2008).
 

 Under section 90.803(18)(a), Florida Statutes (2002), a statement that would otherwise be excluded as hearsay is admissible where that statement is offered against a party and is “[t]he party’s own statement in either an individual or a representative capacity.” Thus, unless ex-cludable under another rule, the challenged statements are admissible as party admissions. Reviewing the appellant’s claim, the circuit court determined, first, that appellant’s statements were admissible as party admissions under section 90.803(18), and second, that the statements were not made in connection with an offer to plead guilty. We agree.
 

 Where a party admission is not clearly part of an attempt to negotiate a
 
 *547
 
 plea bargain,
 
 see Calabro v. State,
 
 995 So.2d 807, 313-14 (Fla.2008), this Court has adopted a two-tier analysis for determining whether a statement falls within the exclusion under rule 3.172(i). First, a court “must determine ‘whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion.’”
 
 Richardson v. State,
 
 706 So.2d 1349, 1353 (Fla.1998) (quoting
 
 United States v. Robertson,
 
 582 F.2d 1356, 1366 (5th Cir.1978)). Second, the court must discern “whether the accused’s expectation was reasonable given the totality of the circumstances.”
 
 Id.
 
 (quoting
 
 Robertson,
 
 582 F.2d at 1366). “In applying the first prong, the trial court must carefully distinguish between the accused’s admissions and the accused’s attempts to negotiate a plea bargain. In other words, the trial court ‘must appreciate the tenor of the conversation.’ ”
 
 Id.
 
 (quoting
 
 Robertson,
 
 582 F.2d at 1367).
 

 Here, the record demonstrates that appellant was not attempting to negotiate a plea deal, but rather intended to confess his guilt to the court and enter a plea of guilty. The status hearing and plea colloquy were called only after appellant mailed a letter confessing guilt to the trial judge. In that letter, appellant began by stating that he wanted to change his plea from “not guilty” to “guilty.” After discussing the events surrounding the crimes and his motivations for committing the offenses, appellant concluded: “As I said before, your Honor, I am guilty. Therefore, I would very much like my plea changed to the true plea of guilty.”
 

 At the status hearing held on February 26, 2003, the day after the letter was received by the judge, the prosecutor indicated that the State was not in a position to negotiate a plea deal:
 

 I will state for the record in open court, there [have] been efforts by his counsel to resolve this case with a plea but the problem -with the facts in this case are such that the state is not in a position to make a plea offer and take away the sentencing possibilities in this case.
 

 Subsequently, appellant’s trial counsel moved to have the letter sealed pending an evaluation of appellant’s competency to proceed. Trial counsel also stated that their advice to appellant was to maintain his silence. Appellant replied:
 

 I’m disregarding that advice. The purpose that I wrote that letter is I wish to change my plea from not guilty to guilty. Yes, I did it, indeed. Those are the facts that I wrote in that letter and it is the truth. Anything else to try to deny that would be a lie....
 

 The trial judge then adjourned the hearing until appellant’s competency could be determined.
 

 At the follow-up hearing held on March 5, 2003, appellant’s attorneys informed the court that their client wished to enter a plea against their advice. After confirming this with appellant, the court agreed to proceed immediately into a plea colloquy. The prosecutor also agreed, stating: “I see no reason not to go forward.
 
 There is no plea agreement in this case
 
 so I would ask the court to determine whether or not he is prepared to accept a plea to the charges.” (Emphasis added.) After a break to permit appellant to consult with his attorneys, the trial judge began the plea proceeding:
 

 Q: Mr. Sehoenwetter, there was an indictment issued by a grand jury on the 29th of August of the year 2000 which charged you with Count I, first-degree murder from a premeditated design. That particular charge, sir, is a mandatory life in prison with a possibility of receiving the death penalty, do you understand that, sir?
 

 A: Yes, sir.
 

 
 *548
 
 Q: That would be the maximum sentence as well as the minimum sentence. The minimum sentence would be life in prison without the possibility of parole.
 

 In essence, sir, the only time you would ever leave prison is if you died in prison, do you understand that sir?
 

 A: Yes, sir.
 

 The court questioned appellant regarding the remaining counts in the indictment. It then asked:
 

 Q: And do you understand, sir, that this is a plea straight up to the Court? There is no plea agreement with the state attorney.
 

 A: Yes, sir.
 

 It is clear from the record that appellant was not attempting to negotiate a plea bargain.
 
 See Richardson,
 
 706 So.2d at 1353;
 
 cf. Calabro,
 
 995 So.2d at 317 (finding in-court admissions of guilt inadmissible in light of defendant’s statement requesting “some kind of plea agreement”). Appellant made no indication that he believed a lighter sentence would be obtained in exchange for his guilty plea. Appellant specifically stated during questioning at the plea colloquy that he understood his only sentencing options following the plea would be death or life in prison. He was asked by the trial judge whether he understood that there was no plea agreement with the State Attorney, and he answered in the affirmative. Further, any such belief would have been unreasonable in light of the fact that the prosecutor had previously stated in open court that the State would not offer a plea deal.
 
 Cf. Richardson,
 
 706 So.2d at 1354 (finding the defendant’s expectation of a plea deal to have been reasonable in light of repeated offers by the State to grant a lower sentence in exchange for a confession). Accordingly, we conclude counsel did not render ineffective assistance by failing to argue that the letter and in-court statements were inadmissible under rule 3.172(i).
 

 2. Failure to Object Based on
 
 Miranda
 
 Violation
 

 Appellant also argues that his attorneys were deficient for failing to object to his in-court admissions on the grounds that he had not been read
 
 Miranda
 
 warnings. Under
 
 Miranda
 
 and its progeny, suspects must be told prior to any custodial interrogation “that they have a right to remain silent, that anything they say will be used against them in court, that they have a right to a lawyer’s help, and that if they cannot pay for a lawyer one will be appointed to help them.”
 
 Traylor v. State,
 
 596 So.2d 957, 966 (Fla.1992) (footnote omitted).
 
 [7]
 
 Appellant asserts that because he was in custody when he made the incriminating statements at the February and March hearings, he was entitled to these warnings. He contends that trial counsel was ineffective under
 
 Strickland
 
 for failing to object on this basis during the penalty phase to the admission of these statements.
 

 When the circuit court rejected this claim in its order denying postconviction relief, it noted: “[T]he Defendant has cited no case law which states that a Defendant is entitled to be read his
 
 Miranda
 
 rights prior to making statements at a court proceeding. Nor has the Court through its own research found any case law which stands for this proposition.” Similarly, appellant has cited no precedent here which would require a defendant to be read
 
 Miranda
 
 warnings prior to testifying in court. Indeed, existing case law leans strongly against this claim. In
 
 United
 
 
 *549
 

 States v. Mandujano,
 
 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), a plurality of the United States Supreme Court held that
 
 Miranda
 
 warnings are not required prior to testimony before a grand jury. The Court noted that
 
 Miranda
 
 was intended to correct the lack of procedural safeguards during custodial police interrogations, when an individual might be pressured into giving up his or her privilege against self-incrimination. However, “the
 
 Miranda
 
 Court simply did not perceive
 
 judicial inquiries
 
 and custodial interrogation as equivalents.”
 
 Id.
 
 at 579, 96 S.Ct. 1768 (emphasis added). The Court explained: “To extend these concepts to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in
 
 Miranda.” Id.
 
 at 580, 96 S.Ct. 1768.
 

 Here, appellant made the incriminating statements in open court, before a judge, after his attorneys advised him on the record to maintain his silence. Because
 
 Miranda
 
 warnings are only necessary pri- or to a custodial police interrogation, the absence of such warnings could not provide defense counsel with grounds for an objection. Again, counsel cannot be deemed ineffective for failing to make a meritless objection.
 
 See Hitchcock,
 
 991 So.2d at 361. We hold that counsel did not render ineffective assistance on the grounds asserted here.
 

 B. Constitutionality of Florida’s Lethal Injection Procedures
 

 Appellant next claims that the lower court erred in denying his request for an evidentiary hearing on the issue of whether Florida’s current lethal injection procedure violates the constitutional prohibition on cruel and unusual punishment.
 
 See
 
 U.S. Const, amend. VIII. In the circuit court’s order denying an evidentiary hearing, the court ruled that because the constitutionality of Florida’s death penalty procedure involved a pure question of law which did not require the court to make any factual determinations, no hearing was necessary. Subsequently, in its order denying the motion, the court summarily rejected the underlying claim, noting that “[t]he Supreme Court of Florida has held on numerous occasions that the Florida procedure for implementing lethal injection does not violate the constitutional protection against cruel and unusual punishment.”
 

 On an initial rule 3.851 motion, an evidentiary hearing must be held whenever the movant makes a facially sufficient claim that requires a factual determination.
 
 See Hutchinson v. State,
 
 17 So.3d 696, 700-01 (Fla.2009) (citing
 
 Amendments to Fla. Rules of Crim. Pro. 3.851, 3.852, & 3.993,
 
 772 So.2d 488, 491 n. 2 (Fla.2000)). “To uphold the trial court’s summary denial of claims raised in an initial postconviction motion, the record must conclusively demonstrate that the defendant is not entitled to relief.”
 
 Hutchinson,
 
 17 So.3d at 700. When no evidentiary hearing has been held by the lower court, this Court must accept the movant’s factual allegations as true to the extent that they are not refuted by the record.
 
 Id.
 
 (citing
 
 Lightbourne v. Dugger,
 
 549 So.2d 1364, 1365 (Fla.1989)). Because a court’s decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on the written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review.
 
 See Davis v. State,
 
 26 So.3d 519, 526 (Fla. 2009) (citing
 
 State v. Coney,
 
 845 So.2d 120, 137 (Fla.2003)).
 

 Appellant’s motion for postcon-viction relief was filed prior to this Court’s decision in
 
 Lightbourne v. McCollum,
 
 969 So.2d 326 (Fla.2007), and prior to the deci
 
 *550
 
 sion of the United States Supreme Court in
 
 Baze v. Rees,
 
 558 U.S. 85, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). In his motion, appellant argued that because
 
 Lightb-oume
 
 was still pending, the constitutionality of lethal injection remained unresolved. Subsequently, in
 
 Lightboume,
 
 this Court rejected the claim that Florida’s current lethal injection procedure violates the Eighth Amendment. We explained that in order for a punishment to be “cruel and unusual,” it must involve “torture or a lingering death” or the “infliction of unnecessary and wanton pain.”
 
 Lightbourne,
 
 969 So.2d at 349 (quoting
 
 Jones v. State,
 
 701 So.2d 76, 79 (Fla.1997)). “[Pjunishment is not cruel or unusual if a state’s protocol does not expose the prisoner to ‘more than a negligible risk of being subjected to cruel and wanton infliction of pain.’ ”
 
 Id.
 
 (quoting
 
 Sims v. State,
 
 754 So.2d 657, 667 (Fla.2000)). Further, “an inmate’s speculative list of horribles that could happen is insufficient to demonstrate more than a negligible risk.”
 
 Id.
 
 We similarly upheld this State’s lethal injection protocols in
 
 Schwab v. State,
 
 969 So.2d 318, 325 (Fla.2007).
 

 Appellant also requested in his motion that the circuit court stay proceedings until the United States Supreme Court had reached a decision in the then-pending
 
 Baze
 
 litigation. In
 
 Baze,
 
 a majority of the Supreme Court determined that Kentucky’s lethal injection procedure was constitutional under the Eighth Amendment, although the Court did not reach a consensus regarding the particular standard for evaluating the constitutionality of state execution protocols in future cases.
 
 See Baze,
 
 553 U.S. at 41, 128 S.Ct. 1520. In
 
 Henyard v. State,
 
 992 So.2d 120, 130 (Fla.2008), we determined that our previous holdings in
 
 Lightboume
 
 and
 
 Schwab
 
 did not conflict with the plurality’s narrow holding in
 
 Baze. See Marks v. United States,
 
 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (stating that when the Supreme Court issues a decision and no rationale receives the vote of a majority of the justices, the holding of the Court is the “position taken by those members who concurred in the judgment on the narrowest grounds”). Further, in
 
 Ventura v. State,
 
 2 So.3d 194 (Fla.),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 2839, 174 L.Ed.2d 562 (2009), we found that “Florida’s current lethal-injection protocol passes muster under
 
 any
 
 of the risk-based standards considered by the
 
 Baze
 
 Court (and would easily satisfy the intent-based standard advocated by justices Thomas and Scalia).”
 
 Id.
 
 at 200. Since then, this Court has repeatedly and summarily rejected constitutional challenges to Florida’s lethal injection procedures.
 
 See, e.g., Davis,
 
 26 So.3d at 526;
 
 Reese v. State,
 
 14 So.3d 913, 919 (Fla.2009);
 
 Tompkins v. State,
 
 994 So.2d 1072, 1081 (Fla.2008).
 

 Rule 3.851 mandates an evidentiary hearing only “on claims listed by the defendant as requiring a factual determination.” Fla. R.Crim. P. 3.851(f)(5)(A)(i). Appellant’s challenge was based specifically on the issues that arose out of the execution of Florida inmate Angel Diaz and on the revised lethal injection protocols subsequently implemented by the Florida Department of Corrections. To the extent appellant asserts that the failure to grant an evidentiary hearing violated his due process right to an individual analysis of the facts of his case, we note that we reviewed the facts surrounding the Diaz execution as well as the revised lethal injection protocols in extensive detail in
 
 Lightbourne. See
 
 969 So.2d at 343-49.
 
 [8]
 
 
 *551
 
 Appellant therefore failed to raise any challenge to Florida’s lethal injection protocols that had not previously been considered by this Court. Accordingly, nothing in his claim required a factual determination. For this reason, and in light of our consistent and summary rejection of challenges of this nature, we conclude that the circuit court did not err in denying an evidentiary hearing on this issue.
 

 C. Ineffective Assistance of Counsel During Penalty Phase
 

 Appellant next claims that, during the penalty phase proceedings, his court-appointed counsel made numerous errors that constituted deficiency under
 
 Strickland.
 
 As discussed above, to prevail on a claim of ineffective assistance of counsel a claimant must show: (1) that his counsel’s performance was deficient, i.e., unreasonable under prevailing professional standards; and (2) that the claimant’s case was prejudiced by the deficiency.
 
 See Gore v. State,
 
 846 So.2d 461, 467 (Fla.2003). To meet this second prong, the claimant must show “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings would have been different.”
 
 Valle v. State,
 
 778 So.2d 960, 965-66 (Fla.2001) (quoting
 
 Williams v. Taylor,
 
 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). “A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Strickland,
 
 466 U.S. at 694,104 S.Ct. 2052;
 
 see Porter v. McCollum,
 
 — U.S. -, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009).
 

 During the penalty phase, the defense’s case focused largely on proving mental health mitigation. Three experts, Dr. William Riebsame, Dr. Nona Currie Prichard, and Dr. Joseph Wu, testified extensively regarding their examinations of the defendant. Dr. Riebsame explained to the jury that Asperger’s Syndrome is a neurological disorder which reflects an abnormal brain pathology. He testified that individuals diagnosed with the condition have impaired social skills and often find it difficult to get along with others. Asperger’s patients also tend to develop an extreme, all-encompassing preoccupation with some area of interest. According to Dr. Rieb-same, “They begin to identify with that particular topic, become very well informed about that topic, and their life centers around that particular topic.” Dr. Riebsame stated that, in appellant’s case, appellant had become focused on sexuality at an unusually early age, engaging in such behavior as dialing 900 phone lines at the age of ten or eleven and viewing pornographic and satanic websites, including child pornography, at an early teenage age.
 
 [9]
 
 In Dr. Riebsame’s evaluation, it was appellant’s obsession with witchcraft, Satanism, and sexuality which caused him to
 
 *552
 
 enter the Friskey home on the night of the offenses. He expressed his opinion that appellant was under an extreme mental or emotional disturbance at the time of the homicides.
 

 Dr. Prichard also described the symptoms of Asperger’s Syndrome. Like Dr. Riebsame, she testified that individuals with the condition have a difficult time getting along with others socially. This was due, she explained, to their inability to perceive or understand others’ emotions. She testified that individuals with this condition also exhibit an uncommon lack of flexibility in making decisions. Whereas most individuals are capable of reassessing a course of conduct as it progresses, Dr. Prichard stated, Asperger’s patients are impaired in their ability to recognize and act on available alternatives. In appellant’s case, she testified that his Asper-ger’s Syndrome made it difficult for him to appreciate on an emotional level how his conduct affected the Friskey family, or to abandon his plan to assault the Friskey daughters once he entered the house. This deficiency caused him to panic when he was recognized by Virginia Friskey, which resulted in appellant lashing out at the girl and her parents. In Dr. Prich-ard’s opinion, appellant’s ability to conform his conduct to the requirements of the law was substantially impaired.
 

 Dr. Wu, a medical doctor admitted as an expert in psychiatry, neuroscience and PET scan imaging, testified that appellant’s PET scan indicated the presence of abnormalities within appellant’s frontal lobe and temporal cortex. He explained that these results are consistent with those of individuals diagnosed with Asperger’s Syndrome. Dr. Wu also testified that without therapy and medication, individuals with such conditions tend to be inflexible and rigid in their thinking and have substantial difficulty with impulse control.
 

 Some testimony was presented regarding appellant’s social background. Deborah Roberts, appellant’s mother, testified that appellant’s biological father, Reece Ingram, was physically abusive to her while she was pregnant with appellant, that she was malnourished during much of her pregnancy, and that she received poor prenatal care. She separated from Ingram when appellant was approximately one year old and they were later divorced. Roberts testified that once appellant started school he had difficulty making friends and was picked on by other children. He also had difficulty sitting still and paying attention, and for a time was placed on Ritalin. Appellant’s performance in school improved, but the Ritalin was discontinued when appellant was in the seventh grade. Roberts eventually married Thomas Scho-enwetter, who adopted appellant, and with whom Roberts later had a daughter. After Roberts and Schoenwetter divorced, Roberts moved with appellant to another city to live with a boyfriend whom Roberts met on the Internet. However, the boyfriend became physically abusive toward appellant, and Roberts and appellant moved away after a year. Roberts testified that appellant began attending adult education classes after the tenth grade and that he had almost completed his coursework at the time of his arrest.
 

 At the evidentiary hearing on the appellant’s rule 3.851 motion, appellant’s attorneys, Assistant Public Defenders J. Randall Moore and George McCarthy, testified that their trial strategy was to use the diagnosis of Asperger’s Syndrome and ADHD to their advantage during the penalty phase. Moore explained that because of appellant’s confession letter, the jury was going to be aware that appellant had entered the Friskey house with the intention of sexually assaulting one or both of the minor females in the house, the youn
 
 *553
 
 ger of whom was only ten years old. In their view, it was necessary to explain this conduct in a manner that could be viewed as mitigating. Moore and McCarthy hoped the jury would come to understand appellant’s obsessions with Satanism and pornography as inherently linked to his previously undiagnosed Asperger’s Syndrome. Their strategy was to present these obsessions as something appellant could not control, and to argue to the jury that appellant was under the influence of an irresistible compulsion on the night he committed the offenses.
 

 Appellant strongly disagreed with his attorneys’ choice of trial strategy. Several witnesses testified at the postconviction hearing that appellant had developed an interest in Christianity while awaiting trial and that he had become active with the prison ministry. According to his trial attorneys, appellant wanted them to refrain from calling many of the witnesses they intended to present during the penalty phase and to rely exclusively on his religious conversion as mitigation. After deliberation, they concluded that this line of testimony would not be beneficial to appellant’s case, and no such witnesses were presented to the jury on this topic. This decision, as well as appellant’s desire that his attorneys not object to the admission of certain victim impact evidence, caused friction between appellant and his attorneys, which resulted in defense counsel filing a motion to withdraw. On direct appeal, we determined that the trial court’s denial of this motion was proper.
 
 See Schoenwetter,
 
 931 So.2d at 870.
 

 Appellant now challenges several aspects of his attorneys’ defense. He argues that Moore and McCarthy (1) failed to object to improper remarks during the State’s opening argument; (2) presented witnesses that portrayed appellant in a negative light; (3) failed to call potential witnesses who could have aided the defense; (4) presented conflicting and unprepared expert witnesses; and (5) failed to sufficiently emphasize mitigating issues during closing argument.
 

 In conducting our review, there is a strong presumption that trial counsel’s performance was not ineffective.
 
 See Strickland,
 
 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Id.
 
 at 689, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might’ be considered sound trial strategy.”
 
 Id.
 
 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 
 Occhicone v. State,
 
 768 So.2d 1037, 1048 (Fla.2000).
 

 1. Failure to Object to State’s Opening
 

 In his first claim of penalty phase deficiency, appellant argues that his attorneys should have objected to a comment made by the State during opening argument. In that statement, the Assistant State Attorney described appellant’s friendship with Chad Friskey, the son of victims Ronald and Haesun Friskey. He informed the jury that appellant had stayed overnight at the Friskey residence on several occasions and was therefore familiar with the layout of the house. He then stated: “This relationship that the defendant had with Chad Friskey also
 
 *554
 
 gave him an opportunity to become acquainted with Chad’s two younger sisters, Theresa and Virginia Friskey. The defendant came to see them as targets of his sexual desires and sexual fantasies.” Appellant argues that this statement improperly presented the aggravating factor of sexual battery to which his attorneys should have objected.
 

 At the postconviction evidentiary hearing, one of appellant’s trial attorneys was asked why he chose not to object to this comment by the State. He explained that evidence of appellant’s sexual interest in the Friskey daughters was almost certainly going to be admitted at trial through various witnesses, including the psychologists, and potentially through Chad Fris-key, who was then listed as a witness. We find that counsel’s decision not to object was reasonable. We explained in
 
 Jones v. State,
 
 949 So.2d 1021, 1032 (Fla.2006), that the purpose of an opening argument is for counsel to inform the jury “what he in good faith expected to be established by the evidence presented at trial.” Because the defense attorneys anticipated that evidence supporting the State’s comments would be presented at trial, they reasonably concluded that they had no grounds on which to object.
 
 See Rogers v. State,
 
 957 So.2d 588, 550 (Fla.2007) (explaining that trial counsel cannot be deemed ineffective for failing to object to comments that are proper). Accordingly, we find that their failure to object to this comment by the State was not deficient under
 
 Strickland.
 
 Further, because evidence of appellant’s interest in the Friskey daughters was in fact presented to the jury, we find that Schoenwetter cannot establish prejudice sufficient to undermine our confidence in the outcome.
 

 2. Introduction of Damaging Evidence
 

 Appellant next objects to his attorneys’ decision to call as witnesses Dr. Riebsame and Commander Mutter, who, appellant asserts, brought evidence of child pornography, pedophilia and Satanism into the proceedings. Appellant argues that this testimony had a detrimental impact on the minds of the jury due to strong public feelings on these matters, prejudicing his case for life in prison. We hold that trial counsel’s performance was not deficient.
 

 Reasonable decisions regarding trial strategy, made after deliberation by a claimant’s trial attorneys in which available alternatives have been considered and rejected, do not constitute deficient performance under
 
 Strickland. See Occhi-cone,
 
 768 So.2d at 1048. Here, the record demonstrates that appellant’s attorneys made a strategic decision to call Dr. Rieb-same as a witness based on their belief that his testimony would be more beneficial than harmful. After deliberation, they concluded that, while parts of Dr. Rieb-same’s testimony may have been unfavorable toward appellant, his testimony was needed to establish as a mitigating circumstance that appellant was under an extreme mental or emotional disturbance at the time of the offense. The attorneys were aware that a portion of this testimony would be harmful, as evidenced by their effort to mitigate any potential negative effect by calling Commander Mutter as a partial rebuttal witness.
 

 We find that these decisions were reasonable. The most negative portion of Dr. Riebsame’s testimony — appellant’s interest in underage females — was almost certainly going to be (and in fact was) admitted as evidence as a result of the letter appellant had written to the trial judge. Rather than improperly emphasizing this evidence, appellant’s attorneys attempted to explain appellant’s own statements in a
 
 *555
 
 manner the jury could potentially view as mitigating. Accordingly, we reject appellant’s claim that the presentation of these witnesses constituted ineffective assistance of counsel.
 

 3. Failure to Present Mitigating Evidence
 

 Third, appellant argues that trial counsel was ineffective for failing to sufficiently investigate and present evidence of his religious faith and social background. Comparable arguments were raised in the recent case of
 
 Jones v. State,
 
 998 So.2d 573 (Fla.2008). There, the appellant argued that trial counsel had been ineffective in failing to present mitigation evidence by “(1) failing to hire a mental health expert and failing to present mental health mitigation; and (2) failing to call witnesses who would have testified about Jones’s childhood.”
 
 Id.
 
 at 582. After reciting the general deficiency/prejudice
 
 Strickland
 
 standard, we explained:
 

 In these circumstances, to determine whether counsel was ineffective, a court must examine not only counsel’s alleged failure to investigate and present possibly mitigating evidence, but the reasons for doing so.
 
 See Wiggins v. Smith,
 
 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (“[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.”) (quoting
 
 Strickland,
 
 466 U.S. at 690-91[, 104 S.Ct. 2052]);
 
 Rose v. State,
 
 675 So.2d 567, 572 (Fla.1996) (stating that in evaluating the competence of counsel “the actual performance of counsel in preparation for and during the penalty phase proceedings, as well as the reasons advanced therefore,” must be considered). Moreover, here, Jones must prove his counsel’s performance actually “deprived [him] of a reliable penalty phase proceeding.”
 
 Rutherford v. State,
 
 727 So.2d 216, 223 (Fla.1998).
 

 Jones,
 
 998 So.2d at 582.
 

 a. Evidence of Appellant’s Religious Faith
 

 Appellant first asserts that his trial attorneys were deficient for failing to present penalty phase testimony regarding the religious conversion he underwent while awaiting trial. As discussed above, appellant was in conflict with his attorneys over whether such evidence should have been presented. He argues that his counsel should have called as a witness Chaplain Victor Dodzweit and that had counsel conducted a reasonable investigation, they could have discovered and called other witnesses who were familiar with appellant’s involvement with the prison ministry. The failure to call these witnesses, he asserts, deprived the jury of significant mitigating evidence.
 

 During the evidentiary hearing on appellant’s motion for postconviction relief, Moore and McCarthy each testified that after discussing the issue with appellant, they became wary as to how such testimony might be perceived by the jury. According to Moore, appellant had come to believe that “because he was saved, he had been forgiven for all of his sins, including what he did to the Friskey family and he was no longer bothered by it.” They also met with Chaplain Dodzweit, who at the time of appellant’s initial imprisonment was conducting Bible studies and individual counseling at the Brevard County Jail. Dodzweit told Moore and McCarthy much the same thing as appellant: that appellant had been saved and that God had forgiven him for his crimes. Moore testi
 
 *556
 
 fied that he and McCarthy were both “stunned” after speaking with Dodzweit:
 

 We thought he would be Exhibit A in proving lack of remorse, because it didn’t seem to have any impact at all on Mr. Schoenwetter, what he had done. We thought, not only would that come out if Mr. Schoenwetter testified, but it would also come out in spades if Reverend Dodzweit testified. We thought it would be very harmful and show a true lack of remorse.
 

 When asked whether such testimony could have been presented in a nondamaging manner, Moore replied:
 

 No, we went round and round about it. We decided that, in the end, the harm outweighed the good. The harm outweighed the benefit. My — nothing personal to Mr. Schoenwetter, but my perception of him was that he would become very, well, self righteous, I guess, in his newly found religion and that would be very offensive to the jury.
 

 Accordingly, no testimony on the specific issue of appellant’s religious faith was presented to the jury. However, Dodzweit was in fact called to testify before the trial judge at the
 
 Spencer
 
 hearing, where he discussed his association with appellant and expressed his belief that appellant would act as a positive influence on other inmates in a prison environment.
 

 The United States Supreme Court has explained that “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.”
 
 Wiggins,
 
 539 U.S. at 521, 123 S.Ct. 2527. In the present case, trial counsel considered the available evidence and made a reasoned decision not to present Dodzweit as a witness or to present evidence of appellant’s religious conversion to the jury. As the circuit court concluded:
 

 It was reasonable for [trial counsel] to believe that the jury might be offended if they heard testimony that the Defendant was now at peace with himself after he killed two people and seriously injured a third. Although this testimony could have presented some mitigating evidence, it was reasonable for Moore and McCarthy to believe the harm would outweigh the good.
 

 We agree and conclude that counsel’s performance was not deficient.
 
 See Gore,
 
 846 So.2d at 470 (“[W]hen an attorney has made a tactical decision not to present mitigating evidence after a full investigation, counsel is not ineffective. Moreover, an attorney’s reasoned decision not to present evidence of dubious mitigating value does not constitute ineffective assistance.”) (citation omitted).
 

 While the extent to which Moore and McCarthy investigated appellant’s additional witnesses is unclear from the record,
 
 [10]
 
 their failure to interview these witnesses should be found “reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.”
 
 Wiggins,
 
 539 U.S. at 521, 123 S.Ct. 2527. “[W]hen a
 
 *557
 
 defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.”
 
 Strickland,
 
 466 U.S. at 691, 104 S.Ct. 2052. Both defense attorneys discussed the issue with appellant and his chaplain and determined that it would have been impossible to present this line of testimony in a nonprejudicial manner. Therefore, we find their decision not to spend more time investigating the issue to have been a reasonable strategic choice, particularly in light of the extensive mental health mitigation that was actually developed. We conclude that they did not render ineffective assistance on these grounds,
 

 b. Evidence of Appellant’s Social Background
 

 Appellant also claims that his attorneys rendered ineffective assistance by failing to present more evidence of his social background. Appellant asserts that counsel should have called as witnesses his biological father, Reece Ingram, his paternal grandmother, Nettie Connor, and Laura Blankman, an investigator hired by the defense. Each of these individuals testified at the postconviction evidentiary hearing. After reviewing their postconviction testimony, we find that counsel was not deficient in failing to present these witnesses and that appellant’s case was not prejudiced by their absence during the penalty phase.
 

 Reece Ingram, appellant’s biological father, testified that he was arrested and sent to prison for five and one-half years for assault and robbery when appellant was approximately eighteen months old and that he was divorced from appellant’s mother while still in prison. Ingram also testified that he visited his son in jail shortly after appellant’s arrest. Prior to that visit, Ingram had not seen appellant since he was seven or eight years old. Ingram stated that he would have been willing to testify at the penalty phase, but asserted that he had never been contacted by the Public Defender’s office.
 

 Nettie Connor, Ingram’s mother and appellant’s paternal grandmother, testified that appellant’s mother, Deborah Roberts, had not permitted her to have a relationship with appellant and that she had only seen him on four occasions. She stated that she spoke by telephone with someone from the Public Defender’s office prior to appellant’s trial, but was not asked to testify. Connor expressed the opinion that had appellant been permitted to have a relationship with her and her family, he would not have been in trouble with the law.
 

 Laura Blankman testified that she was a professional investigator specializing in death penalty mitigation. She explained that she was hired by the defense to investigate appellant’s family history. At the time she began her investigation, funding had only been obtained for thirty hours of work, although she stated that a complete investigation often took 400 hours. Much of her allotted time was spent interviewing appellant and his mother. Blankman discussed in detail Roberts’ familial history of abuse, particularly by Roberts’ father, with whom Roberts and appellant lived until appellant was approximately four years old. She also learned about appellant’s difficult childhood. Blankman testified that she felt more investigation was needed, particularly regarding appellant’s paternal family, but that no additional funding could be obtained. However, Blankman continued to be involved in the case. She ultimately contributed approximately 100 hours toward the investigation, and even attended a portion of appellant’s trial, where she sat at the defense table.
 

 
 *558
 
 During the evidentiary hearing, appellant’s attorneys testified that they were unable to locate Ingram while preparing their case for mitigation. They mailed a letter requesting Ingram’s assistance to addresses previously associated with him but received no response. Moore testified that he spoke with Connor but found that she would not provide any information that could be used to contact her son. According to Moore, Connor indicated that Ingram would not cooperate with their investigation. Regarding Laura Blankman, Moore testified that she had been hired specifically to locate Ingram or any other members of appellant’s paternal family. When her efforts proved unsuccessful, Moore and McCarthy determined that she could do nothing further and that there was no remaining need for her services. Ultimately, they concluded that any information pertaining to appellant’s paternal family would be of limited use given that appellant had little contact with that side of his family during childhood.
 

 We conclude that appellant’s attorneys were not deficient within the meaning of
 
 Strickland.
 
 The record reveals that Moore and McCarthy made strong efforts to locate appellant’s paternal family, which included contacting Connor by letter and by telephone, mailing letters to Ingram, and hiring Laura Blankman. The investigation was only discontinued when they determined it would not be beneficial to appellant’s defense. Based on the information gathered from Connor and Blank-man, we find that this decision to limit the investigation was an entirely reasonable professional judgment.
 
 See Wiggins,
 
 539 U.S. at 521, 128 S.Ct. 2527.
 

 Further, we find that the failure to call these witnesses does not satisfy the
 
 Strickland
 
 requirement of prejudice. With regard to the absence of Reece Ingram and Nettie Connor, the circuit court explained:
 

 The only additional information that these witnesses would have provided was that Deborah Roberts, the Defendant’s mother, prevented the Defendant from having any contact with his biological father or his paternal family members. However, it is questionable whether the Defendant would have been better off having a relationship with Ingram considering that the evidence showed that Ingram physically abused the Defendant’s mother while she was pregnant with him and then went to prison for aggravated assault and burglary. Had this testimony been presented at the penalty phase, it is unlikely that the jury would have given it much weight.
 

 With regard to Laura Blankman, much of the testimony she could have presented during the penalty phase was in fact introduced into evidence through the testimony of Deborah Roberts. Specifically, Roberts testified that she was physically abused by appellant’s father while pregnant and that appellant was abused by her later boyfriend. The absence of Ingram, Connor, and Blankman as witnesses does not undermine our confidence in the outcome of the proceedings.
 
 See Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052.
 

 c. Failure to Integrate Social and Medical Evidence
 

 We next address appellant’s claim that trial counsel was ineffective for failing to call an additional mental health expert who could relate evidence of appellant’s religious conversion to the mental health testimony presented by other experts. Appellant relies primarily on the testimony of Dr. Henry Dee, who was admitted as an expert in the field of forensic psychology and neuropsychology at the postconviction evidentiary hearing.
 

 
 *559
 
 Dr. Dee reviewed the reports and testimony of the medical experts who testified during the penalty phase, as well as other documents relating to appellant’s crime and conviction. Dr. Dee testified that based on his own testing, he believed appellant suffered from frontal lobe damage. He also interviewed appellant and his relatives and learned that appellant had moved frequently as a child. Dr. Dee testified that this would have been particularly difficult for a child with Asperger’s Syndrome and ADHD, and would have impaired appellant’s ability to develop social skills as a child. He also testified that individuals with appellant’s conditions have difficulty expressing remorse because they lack empathetic understanding of others. He noted that in letters written following appellant’s religious conversion, appellant had frequently expressed remorse for his crimes.
 

 We find that the absence of this testimony did not prejudice appellant’s case under
 
 Strickland.
 
 Similar testimony was presented by other expert witnesses during the penalty phase. Dr. Wu testified regarding appellant’s frontal lobe damage, and Dr. Riebsame and Dr. Prichard both explained how appellant’s ADHD and As-perger’s Syndrome would have affected his behavior at the time of the offenses. Appellant’s mother testified regarding his difficult childhood. Further, the three mitigating factors to which Dr. Dee testified— extreme mental or emotional disturbance, inability to conform conduct to the requirements of the law, and the defendant’s age — were all considered by the trial court in its sentencing order. Dr. Dee’s testimony that appellant expressed remorse in his letters was at least partially considered when the trial court weighed the nonstatu-tory mitigator that “the defendant accepted responsibility by pleading guilty.”
 
 Schoenwetter,
 
 931 So.2d at 865 n. 4. In light of these considerations, we find that appellant has failed to demonstrate prejudice such that our confidence in the outcome of the proceedings is undermined.
 
 See Valle,
 
 778 So.2d at 965-66;
 
 see also Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, we reject appellant’s claim of ineffectiveness on this issue.
 

 4. Deficiency in Presenting Expert Witnesses
 

 Fourth, appellant asserts that trial counsel was deficient for presenting unprepared and inconsistent expert witnesses. Appellant first argues that his attorneys rendered ineffective assistance by calling expert witnesses, Dr. Prichard and Dr. Riebsame, who testified to conflicting mitigating circumstances. Second, appellant claims his attorneys were deficient for failing to provide these experts with copies of appellant’s videotaped police interview. We find both claims to be without merit.
 

 We first find that the expert testimony was complementary rather than conflicting. Dr. Riebsame testified that appellant, based on his PET scan, Asperger’s Syndrome, and the circumstances of the offense, was under an extreme mental or emotional disturbance at the time of the offense. Dr. Prichard, in her testimony, explained that appellant, due to his Asper-ger’s Syndrome, was inflexible in his ability to act on options and select available alternatives once he had begun a course of action. She expressed her opinion that appellant’s capacity to conform his conduct to the requirements of law was substantially impaired. With regard to the deficient performance prong of appellant’s
 
 Strickland
 
 claim, it was not unreasonable for the trial attorneys to have concluded that the testimony of two experts would be more beneficial than one. With regard to the prejudice prong, the experts did not contradict each other. Rather, they each tes-
 
 *560
 
 tiffed to a separate statutory mitigating factor based on the effects of Asperger’s Syndrome and ADHD. Because the trial court in fact considered and weighed both of these factors as mitigation,
 
 see Schoenwetter,
 
 931 So.2d at 865, the experts’ testimony seems to have helped rather than harmed the defense.
 

 Second, appellant’s attorneys were not deficient for failing to provide Dr. Rieb-same and Dr. Prichard with copies of the videotaped police interview, nor do we find that our confidence in the outcome of the proceedings is undermined by this oversight. Both experts testified extensively regarding their professional qualifications, both had access to a wide range of personal materials relating to appellant’s background, and both conducted interviews and psychological testing with appellant himself. In light of this testimony, it is unlikely that the jury would have concluded the experts were unprepared because they had not viewed a videotape of the defendant’s initial confession. Further, Dr. Riebsame was recalled after being given the opportunity to view the video and testified that it had no impact on his initial testimony. Dr. Prichard admitted that she had not viewed the tape, but was then asked whether certain behaviors would indicate Asperger’s Syndrome. She responded that they would. This exchange took place after the jury had already viewed the tape themselves. Later, on redirect examination, Dr. Prichard stated that she had read the interrogating officers’ accounts of appellant’s confession. She then testified that the substance of his confession did not change her opinion as to how appellant’s mental impairments would have affected his actions at the time of the crime.
 

 5. Deficient Closing Argument
 

 Finally, appellant argues that during closing argument, his trial counsel failed to stress the importance of appellant’s lack of impulse control, instead focusing on appellant’s preoccupation with Satanism and sexuality. Appellant asserts that counsel should have relied more heavily on the testimony of Dr. Wu concerning the results of appellant’s PET scan. He argues that this deficiency deprived the jury of the understanding that his lack of impulse control was related to frontal lobe damage. Appellant argues that emphasizing this information in closing would have provided greater support for the two statutory mental health mitigating circumstances weighed by the jury.
 

 After reviewing the record, we find that the appellant’s characterization of his counsel’s closing statement is inaccurate. The closing argument for the defense was delivered by George McCarthy, who in fact argued that appellant’s lack of impulse control and his inability to view options and reassess his course of conduct was what led him to commit the crime. McCarthy discussed the testimony of Dr. Wu and the results of the PET scan. He informed the jury that the PET scan provided physical evidence of appellant’s neurological disorders and requested that the jury give this evidence great weight as a mitigating factor. After discussing appellant’s obsessions with sex and video games, during which he described the testimony of appellant’s friends and family, McCarthy again tied the evidence to appellant’s diagnosis of Asperger’s Syndrome and lack of impulse control. Therefore, in contradiction to appellant’s argument here, it is clear that trial counsel did not fail to discuss appellant’s mental health mitigation during the closing argument. Appellant’s claim of deficiency on these grounds is therefore rejected.
 

 D.
 
 Roper v. Simmons
 

 Next, appellant raises several claims of error based on the decision of the
 
 *561
 
 United States Supreme Court in
 
 Roper v. Simmons.
 
 First, he argues that in light of the evolving standards of decency relied on by the Court in
 
 Roper,
 
 his execution would ■violate the Eighth and Fourteenth Amendments to the United States Constitution. Second, he argues that based on
 
 Roper
 
 and this Court’s decision in
 
 Urbin v. State,
 
 714 So.2d 411, 418 (Fla.1998) (explaining that the age-related statutory mitigator becomes weightier the closer the defendant is to the age where the death penalty is constitutionally barred), the trial court erred in not affording more weight to his age-related statutory mitigating circumstance. Third, appellant argues that death would be a disproportionate punishment based on his age, immaturity, mental defects, and related mitigating circumstances.
 

 With regard to appellant’s argument that his death sentence is unconstitutional under
 
 Roper,
 
 we have consistently rejected such claims in cases where the defendant was not below eighteen years of age at the time of the criminal offense. We held in
 
 Hill v. State,
 
 921 So.2d 579, 584 (2006), that
 
 “Roper
 
 only prohibits the execution of those defendants whose
 
 chronological
 
 age is below eighteen.”
 
 See also Kearse v. State,
 
 969 So.2d 976, 992 (Fla.2007) (denying relief based on
 
 Roper
 
 where appellant was eighteen years and three months old at the time of the offense and suffered from low-level intellectual functioning and mental and emotional impairments). In this case, appellant’s age was eighteen years and nine months at the time of the offense. Therefore,
 
 Roper
 
 does not render his sentence of death unconstitutional.
 

 Appellant also argues that the trial court should have assigned more than “little weight” to his age-related mitigating circumstance based on
 
 Roper.
 
 We find this claim to be procedurally barred. This Court has held that “[p]ro-ceedings under rule 8.850 are not to be used as a second appeal; nor is it appropriate to use a different argument to re-litigate the same issue. Likewise, issues that could have been raised on direct appeal, but were not, are not cognizable through collateral attack.”
 
 Torres-Arboleda v. Dugger,
 
 636 So.2d 1321, 1323 (Fla.1994) (citation omitted). In appellant’s direct appeal, we considered the weight assigned to the statutory and non-statutory mitigating circumstances:
 

 The defendant ... takes issue with the weight that was given to the four statutory mitigating circumstances, which were given little weight, and with the weight given to two of the nonstatu-tory mitigating circumstances. Although Schoenwetter maintains these mitigating factors were not accorded the proper weight, he has failed to even argue, much less demonstrate, why the weight given by the trial judge was not appropriate under the facts of this case. The weight given to these mitigators lies within the discretion of the trial court, and there has been no showing that the trial court abused its discretion. Therefore, we find no error in the trial court’s consideration of these mitigating factors.
 

 Schoenwetter,
 
 931 So.2d at 875 (footnote omitted). As to appellant’s specific argument that
 
 Roper
 
 dictates a different result,
 
 Roper
 
 was decided well before appellant’s direct appeal was heard by this Court. Appellant had the opportunity to raise these arguments but failed to do so. Thus, the issue is not cognizable through collateral attack.
 
 See Torres-Arboleda,
 
 636 So.2d at 1323.
 

 Third, appellant argues that this Court should reweigh the aggravating and mitigating circumstances surrounding his death sentence in light of the United States Supreme Court’s decision in
 
 Roper.
 
 We addressed the proportionality of ap
 
 *562
 
 pellant’s sentence on direct appeal and determined that death was a proportionate punishment in light of the totality of the circumstances of the offense, and in light of the circumstances of similar cases in which death sentences have been imposed.
 
 See Schoenwetter,
 
 981 So.2d at 875-76. Again, because this issue was raised and decided on direct appeal, appellant is procedurally barred from raising the issue here.
 
 See Torres-Arboleda,
 
 636 So.2d at 1328.
 

 E. Cumulative Error
 

 In his last claim under Rule 3.851, appellant argues that the cumulative effect of the errors asserted above require this Court to vacate his sentence. Claims of cumulative error do not warrant relief where each individual claim of error is “either meritless, procedurally barred, or [does] not meet the
 
 Strickland
 
 standard for ineffective assistance of counsel.”
 
 Israel v. State,
 
 985 So.2d 510, 520 (Fla.2008);
 
 see Bradley v. State,
 
 33 So.3d 664 (Fla.2010);
 
 Reese,
 
 14 So.3d at 920;
 
 Parker v. State,
 
 904 So.2d 370, 380 (Fla.2005). Because we find that each individual claim of error fails on at least one of these three grounds, we reject the claim of cumulative error.
 

 III. PETITION FOR WRIT OF HABE-AS CORPUS
 

 A.
 
 Roper v. Simmons
 
 and
 
 Atkins v. Virginia
 

 Finally, we review the two claims raised in appellant’s petition for writ of habeas corpus. As the first of his claims, appellant argues that his sentence of death is unconstitutional due to evolving standards of decency cited by the United States Supreme Court in
 
 Roper v. Simmons
 
 and
 
 Atkins v. Virginia.
 
 This Court has held that “[h]abeas corpus is not to be used for additional appeals of issues that could have been, should have been, or were raised on appeal or in other postconviction motions.”
 
 Mills v. Dugger,
 
 559 So.2d 578, 579 (Fla.1990). In
 
 Mills,
 
 we rejected the petitioner’s habeas claims, noting that most had been raised either on direct appeal or in the petitioner’s postconviction motion.
 
 See id.
 
 In this case, appellant has already raised
 
 Roper
 
 in his rule 3.851 motion. Because every argument raised in this portion of appellant’s habeas petition either could have been or in fact was raised in his motion filed pursuant to rule 3.851, this claim is rejected as procedurally barred.
 

 Additionally, even if this claim were not barred for procedural reasons, appellant would not be entitled to relief on the merits under either
 
 Roper
 
 or
 
 Atkins.
 
 As explained above,
 
 Roper
 
 only prohibits the execution of defendants whose chronological age was below eighteen at the time of their capital offense.
 
 See Reese,
 
 14 So.3d at 920. Because appellant was eighteen years and nine months of age at the time of his offense,
 
 Roper
 
 does not render his death sentence unconstitutional.
 

 Likewise, appellant is not entitled to relief under
 
 Atkins.
 
 In that case, the United States Supreme Court held that it is unconstitutional to execute an individual who suffers from mental retardation.
 
 See Atkins,
 
 536 U.S. at 321, 122 S.Ct. 2242. Under Florida law, mental retardation is defined as “significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18.”
 
 Jones v. State,
 
 966 So.2d 319, 326 (Fla.2007) (quoting § 921.137(1), Fla. Stat. (2005));
 
 see also Hurst v. State,
 
 18 So.3d 975, 1008 n. 9 (Fla.2009). To assert a valid claim under
 
 Atkins,
 
 a defendant must establish that he or she has an IQ of 70 or below.
 
 Nixon v. State,
 
 2 So.3d 137, 142
 
 *563
 
 (Fla.2009);
 
 Jones,
 
 966 So.2d at 329;
 
 Zack v. State,
 
 911 So.2d 1190, 1201 (Fla.2005). We have held on several occasions that other mental defects are not entitled to the same consideration as mental retardation.
 
 See, e.g., Reese,
 
 14 So.3d at 920 (rejecting
 
 Atkins
 
 claim where postconviction testimony indicated that the defendant was under a “severe emotional disturbance” at the time of the offense);
 
 Connor v. State,
 
 979 So.2d 852, 867 (Fla.2007) (rejecting claim where the defendant suffered from mental and psychological disorders such as organic brain damage, frontal lobe damage, mi-crographia, and stuttering, on grounds that these conditions were different from mental retardation);
 
 Lawrence v. State,
 
 969 So.2d 294, 300 n. 9 (Fla.2007) (declining to extend
 
 Atkins
 
 to the mentally ill).
 

 Here, appellant has made no assertion that he suffers from mental retardation. Instead, his claim is based on diagnoses of Asperger’s Syndrome, ADHD, and frontal lobe damage. While these conditions may be considered as mitigating circumstances at sentencing — and, indeed, were considered as mitigation by the trial court — mere mental illness does not serve as a bar to execution under
 
 Atkins. See Diaz v. State,
 
 945 So.2d 1136, 1152 (Fla.2006). Further, the evidence presented during the penalty phase and postconviction proceedings indicate that appellant’s IQ is significantly higher than 70. The trial court noted in its sentencing order that the experts who testified at the penalty phase had agreed that appellant’s IQ was approximately 130. Dr. Dee, appellant’s postconviction mental health expert, testified at the evidentiary hearing that appellant had received a score of 123 on a more recent IQ test.
 

 B. Ineffective Assistance of Appellate Counsel
 

 Pursuant to appellant’s second claim, we review whether his appellate counsel was constitutionally deficient under
 
 Strickland.
 
 Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus.
 
 See Freeman v. State,
 
 761 So.2d 1055, 1069 (Fla.2000). Consistent with
 
 Strickland,
 
 to grant habeas relief based on ineffective assistance of appellate counsel this Court must determine,
 

 first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
 

 Pope
 
 v. Wainwright,
 
 496 So.2d 798, 800 (Fla.1986);
 
 see Freeman,
 
 761 So.2d at 1069;
 
 Thompson v. State,
 
 759 So.2d 650, 660 (Fla.2000). In raising such a claim, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.”
 
 Freeman,
 
 761 So.2d at 1069. Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion.
 
 See Rutherford v. Moore,
 
 774 So.2d 637, 643 (Fla.2000). “If a legal issue “would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.”
 
 Id.
 
 (quoting
 
 Williamson v. Dugger,
 
 651 So.2d 84, 86 (Fla.1994)).
 

 Here, it is argued that appellate counsel was deficient for failing to properly present the issue of a conflict between appellant and his trial counsel. We find
 
 *564
 
 this claim to be without merit. Due to conflicts with their client, trial counsel filed a motion to withdraw during the penalty phase. The trial court denied the motion and the issue was raised on direct appeal. We concluded:
 

 The trial court properly denied the motion to withdraw. This record does not demonstrate that the attorney-client relationship had deteriorated to the point where counsel could no longer give effective aid in the fair representation of the defense.
 
 See Wilson v. State,
 
 753 So.2d 683, 688 (Fla. 3d DCA 2000). General loss of confidence or trust standing alone will not support withdrawal of counsel.
 
 See Johnston v. State,
 
 497 So.2d 863, 868 (Fla.1986).
 

 Schoenwetter,
 
 931 So.2d at 870.
 

 We find that appellant has failed to demonstrate any “specific, serious omission” on the part of appellate counsel.
 
 Freeman,
 
 761 So.2d at 1069. Although appellant raises testimony adduced at the postcon-viction evidentiary hearing demonstrating friction between himself and his trial attorneys, none differs in substance from the evidence presented on direct appeal.
 
 [11]
 
 Accordingly, we hold that appellate counsel did not render ineffective assistance.
 

 IY. CONCLUSION
 

 For the reasons discussed above, we affirm the circuit court’s denial of appellant’s motion for postconviction relief. We also deny appellant’s petition for writ of habeas corpus.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [2]
 

 . The "extreme mental or emotional disturbance” circumstance was based on evidence that Sehoenwetter suffers from Asperger’s Syndrome and Attention Deficit Hyperactivity Disorder (ADHD). Although the trial court found that this circumstance had been proven by the greater weight of the evidence, it noted that when the defendant was evaluated for competency during the penalty phase, the two court-appointed psychiatrists who conducted the evaluation each testified that symptoms of Asperger’s Syndrome were not present or recognizable during the interviews they conducted with him. The trial court subsequently assigned little weight to this factor, finding that Schoenwetter’s alleged impairments did not explain the series of conscious decisions he made in committing the crimes, that his actions were intentional and deliberate, and not impulsive as suggested by the defense experts, and that they did not describe an individual whose ability to see options was impaired.
 

 [3]
 

 .This factor was also based on testimony regarding the diagnosis of Asperger’s Syndrome and ADHD. The trial court explained its decision to assign little weight to this factor by noting that "the Defendant's course of conduct was not consistent with the symptoms of Asperger’s Syndrome. Furthermore, the Defendant managed to avoid breaking the law up until this point in his life, despite the fact that Asperger’s Syndrome is a lifelong condition.”
 

 [4]
 

 . The court explained that although one defense expert, Dr. William Riebsame, had testified to this factor, Schoenwetter appeared to be "mature beyond his years.” This determination was based on the agreement of all the experts who testified that Schoenwetter was very intelligent, with an IQ of approximately 130, as well as from the court’s observations of his behavior.
 

 [5]
 

 . In Claim I of his motion to vacate, appellant argued that he had received ineffective assistance of counsel during the pretrial phase. This claim was based on (1) counsel's failure to object to the introduction into evidence of Schoenwetter’s letter confessing his guilt to the court; (2) counsel’s failure to object on Fifth Amendment grounds to the admission of statements made by Schoenwetter at the February 26 status hearing and March 5 plea proceeding; (3) counsel’s failure to file a motion to suppress the letter under Florida Rule of Criminal Procedure 3.172 as statements made during an offer to plead guilty; and (4) counsel's failure to file a motion to suppress statements made in the letter and at the February 26 status hearing "on additional grounds.”
 

 In Claim II, appellant argued that Florida’s lethal injection procedure violates the constitutional prohibition of cruel and unusual punishment.
 

 In Claim III, appellant argued that because his plea of guilty was not knowing, intelligent, and voluntary, trial counsel was constitutionally defective for failing to move to withdraw the plea. (Claim III was voluntarily withdrawn before the circuit court ruled on the motion.)
 

 In Claim IV, appellant argued that he received ineffective assistance of counsel during the penalty phase. He claimed that his attorneys had erred by (1) introducing evidence of
 
 *545
 
 child pornography, pedophilia, and Satanism into the proceedings: (2) failing to object to the State's remarks in opening argument relating to appellant’s sexual interest in Theresa and Virginia Friskey; (3) failing to present all available mitigation evidence, specifically by
 

 (a) failing to present evidence of appellant’s religious conversion and social background,
 

 (b) failing to call Laura Blankman, a private investigator hired by the defense for the purposes of developing mitigation evidence, and
 

 (c) failing to call experts who would have integrated appellant's social history with medical evidence that had been presented regarding appellant’s mental health; (4) calling experts who gave conflicting testimony, failing to provide those experts with a video of appellant's police interrogation, and failing to discuss important points from their testimony during closing argument.
 

 In Claim V, appellant argued that his sentence of death is unconstitutional under
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).
 

 Finally, under Claim VI, appellant argued that the cumulative effect of all the claims in his motion entitled him to relief.
 

 [6]
 

 . This rule was previously designated as Florida Rule of Criminal Procedure 3.172(h), but became rule 3.172(i) following an amendment to the statute. The text of the rule was unaltered by the amendment.
 
 See In re Amendments to Fla. Rules of Crim. Procedure 3.170 & 3.172,
 
 938 So.2d 978 (FIa.2006).
 

 [7]
 

 . We have defined "custody” as the restriction of a suspect's freedom of movement to a degree associated with formal arrest.
 
 See Ramirez v. State, 739
 
 So.2d 568, 573 (Fla.1999).
 

 [8]
 

 . Appellant also cites the failed execution of Ohio inmate Romell Broom, asserting that such an occurrence could "easily” happen in this case. However, there is no discussion of
 
 *551
 
 the specific procedures being challenged and no claim that there has been any change to Florida’s lethal injection protocols that would require this Court to abandon its existing precedent. As we explained in
 
 Lightboume,
 
 a defendant's "speculative list of horribles” is insufficient to establish a challenge to a state's death penalty protocols under the Eighth Amendment.
 
 See Lightbourne,
 
 969 So.2d at 349.
 

 [9]
 

 . After Dr. Riebsame’s testimony, defense counsel called Commander Bobby Mutter of the Titusville Police Department as a partial rebuttal witness to counter the assertion that appellant was interested in child pornography, as opposed to adult pornography. Commander Mutter testified concerning an incident in which appellant's mother brought to the police a CD-ROM containing what she believed might be child pornography that her son had downloaded from the Internet. Commander Mutter informed the jury that he and another investigator reviewed the images, but determined that the women depicted therein were all eighteen years of age or older. No further action was taken by the police on the matter.
 

 [10]
 

 . In addition to Victor Dodzweit, appellant presented four witnesses familiar with his religious conversion — David Musalo, Richard Dean, Thomas Wood, and Frederick Shelor— at the postconviction evidentiary hearing. Musalo, Dean, and Wood each testified that they were volunteers or employees of the prison ministry at the time of appellant’s incarceration. Shelor was a fellow inmate, also involved in the prison ministry. All four testified that they were never contacted or interviewed by appellant’s defense counsel. When asked about these individuals during his own postconviction testimony, Randall Moore responded that he was familiar with their names, but could not recall their precise roles in the defense investigation.
 

 [11]
 

 . The only new evidence presented is taken from the postconviction testimony of Randall Moore. Moore was asked whether appellant pled guilty because he felt that he should be punished for his crime. Moore responded: "I don’t know what his thinking was.” Reviewing the transcript, this statement appears to be an expression of frustration rather than’ an admission that he was unable to give effective counsel to the defendant. Laura Blank-man also testified that appellant's relationship with his attorneys was strained. As we explained on direct appeal, evidence of this kind is insufficient to support withdrawal of counsel.
 
 See Schoenwetter,
 
 931 So.2d at 870 (citing
 
 Johnston v. State,
 
 497 So.2d 863, 868 (Fla.1986)).