# Supreme Court of Florida

_____

No. SC12-79
_____

**DAVID SYLVESTER FRANCES**
Appellant,

vs.

**STATE OF FLORIDA**
Appellee.

_____

No. SC12-1514
_____

**DAVID SYLVESTER FRANCES**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.**
Respondent.

[April 17, 2014]

PER CURIAM.

David Sylvester Frances appeals an order of the circuit court denying his

motion to vacate his convictions of first-degree murder and sentences of death filed

under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

On direct appeal to this Court, "Frances raise[d] three issues, each of which encompasse[d] a number of sub-issues. He claim[ed] that: (1) the trial court improperly restricted his presentation of guilt and penalty phase evidence that was relevant to his relative culpability for the crimes and what sentence he should receive; (2) the trial court improperly found the heinous, atrocious, or cruel aggravating circumstance (HAC), excluded existing mitigating evidence, and concluded that the aggravating circumstances outweighed the mitigating circumstances; and (3) Florida's death penalty statute is unconstitutional under Ring v. Arizona." Frances v. State, 970 So. 2d 806, 812-13 (Fla. 2007). This Court affirmed Frances' convictions of first-degree murder and his sentences of death. Id. at 823.

On April 9, 2009, Frances filed a Motion to Vacate Judgment of Conviction and Death Sentence. Following a case management conference, the postconviction court granted an evidentiary hearing as to the following claims raised in Frances' Motion to Vacate: Failure of trial counsel to object to the Court's improper comments regarding "Southerners" and "Yanks"; failure of trial counsel to object to the "cause" strike of Venireperson Roberts; failure of trial counsel to object to comments erroneously informing the jury that a list of mitigators would be

- 2 -

provided at the penalty phase; failure of trial counsel to investigate and present

available mitigation; proffered evidence regarding Frances' drug abuse and

dependency; proffered evidence regarding the good deeds performed by Frances

throughout his life; proffered evidence regarding Frances' bouts with stuttering.[1]

## I.   STATEMENT OF THE CASE AND FACTS

The facts of this case are set forth in Frances' direct appeal of his death

sentence:

> David Sylvester Frances and his younger brother Elvis Frances were charged by indictment with the first-degree murders of Helena Mills and JoAnna Charles, the robbery of Mills' automobile, and two counts of the petit theft of Charles' jewelry and a Playstation video game system belonging to Mills' son.

> Gleneth Byron, the mother of the Frances brothers, was a close friend of Mills and lived about five minutes from Mills' condominium in Orlando.  The two families often socialized together.  The Frances brothers had been living with Byron for about a month and neither was employed.  Byron asked the brothers to move out and planned to give them money for bus tickets to Tallahassee, where the family had

---

1.  The trial court summarily denied relief, without an evidentiary hearing, on the following claims raised in Frances' Motion to Vacate: Failure of trial counsel to file adequate motions to suppress statements made to law enforcement; Failure of trial counsel to file a motion in limine to exclude references to "Ring neck Road"; Failure of trial counsel to exercise a cause or peremptory challenge on juror Kristich; Failure of trial counsel to object and move for mistrial after the defendant's mother caused a ruckus in the courtroom; Failure of trial counsel to object and move for mistrial regarding identification of mother as a DCF "Secretary for Adult Protective Investigations"; Failure of trial counsel to object and move for mistrial regarding suggestion of lack of remorse, callousness; Failure of trial counsel to object and move for mistrial regarding suggestion of rape or motive of rape; Eighth Amendment claims against Florida's lethal injection procedures; and cumulative error.

lived previously. David Frances called Byron around noon on November 6, 2000, to tell her that the brothers had a ride to Tallahassee. When Byron returned home at 5 p.m., her sons and all of their belongings were gone.

Early that same morning, the Frances brothers rang the doorbell at Mills' condominium. Mills' thirteen-year-old son Dwayne Rivers answered the door and talked to the brothers briefly for a minute or two. Rivers knew the brothers from when they all had lived in the Virgin Islands. Rivers told the brothers that JoAnna Charles, who was a sixteen-year-old family friend living with Mills, was staying home from school that day because she was sick. The brothers departed and Rivers left for school at 8:45 a.m. When Rivers returned home at 6 p.m., he saw Charles' red Toyota in front of the condominium, but he did not see his mother's green Mazda 626 in the garage. Rivers called for Charles and banged on the locked door of the master bedroom, but did not receive a response. When Rivers entered the master bedroom through a sliding glass door on the balcony, he discovered the bodies of his mother and Charles on the floor of the bathroom. Rivers phoned Byron and then called 911.

When the paramedics arrived, they discovered Charles' body on top of Mills' body. Both women had been strangled with an electric cord. A cord was still wrapped around Charles' neck. The bodies were in rigor mortis. There were no signs of forced entry into the condominium. The medical examiner testified that Mills had multiple recent abrasions to her face, injuries to her neck, ruptured blood vessels in her face, and a cut across her neck caused by the cord being wrapped around her neck and pulled at each end. Charles had a groove around her neck with superficial lacerations. She also had crescent-shaped fingernail marks on her right neck caused by her attempts to remove either the ligature or hands from her neck. The material under Charles' nails matched her own DNA. Material removed from Mills' nails was identified as male DNA. While neither David nor Elvis could be excluded as the contributor of the material found under Mills' nails, the sample was so limited that this finding was not significant. The electrical cord around Charles' neck was tested for latent fingerprints, but there were not enough ridgelines on the latent prints to enable a match. No DNA testing was conducted on the electrical cord because the chemicals used for the latent print

testing would have destroyed the DNA. Conversely, had the cord been tested for DNA, it would have obliterated any latent prints.

The tag number and information about Mills' stolen vehicle were entered into the national law enforcement data base. On December 5, 2000, the Frances brothers and three other individuals were stopped in Mills' vehicle in DeKalb County, Georgia. Elvis was driving the vehicle and David was a passenger in the back seat. The vehicle still bore Mills' license plate. David claimed that he had bought the vehicle in Tallahassee, but was unable to name the seller.

Orlando police detectives traveled to Georgia to interview the brothers. Twenty-year-old David gave a statement after being advised of his Miranda[2] rights and waiving them. In this statement, David originally denied any knowledge of the murders, claimed that he and Elvis took a bus from Orlando to Tallahassee, and stated that he had bought Mills' car from someone named "Will" in Tallahassee. David subsequently admitted being at Mills' house on the morning of the murders and stated that Elvis killed both victims. David admitted that he helped Elvis move the bodies and participated in stealing Mills' car. David also admitted that the brothers took Mills' car and drove it to Tallahassee.

The officers then interviewed sixteen-year-old Elvis at the juvenile detention facility where he was being held. The officers played David's taped interview for Elvis. Elvis related a different version of events, claiming that David also participated in the murders. The brothers were arrested for first-degree murder and transported back to Florida. An attempt to record their conversations in the transport van was unsuccessful because the equipment did not work.

David was interviewed a second time on December 6. During this interview, David related the following additional details about the murders. Byron wanted the brothers out of her house, but they had no money and no place to go. After talking to Rivers on Monday morning, the brothers decided to steal Mills' car. They went back to Mills' house where they met her in her garden. Mills told the brothers

2. Miranda v. Arizona, 384 U.S. 436 (1966).

- 5 -

to go inside. When she came in, both brothers jumped her. David strangled Mills with his hands until she passed out. Elvis attempted to do the same to Charles, but had difficulty because Charles struggled with him. Both brothers moved the women into the bedroom and David then strangled Mills with an electric cord. Because Charles "still had life in her," the brothers wrapped the electric cord around her neck and each pulled on an end in order to kill her. They took jewelry and a Playstation from the house and drove off in Mills' car. They pawned the stolen items for $240. They drove to Tallahassee and then to Georgia in Mills' car. Both of David's taped interviews were published to the jury at trial.

Mills' vehicle was sealed and returned to Orlando in a sealed car trailer. David's prints were lifted from the rear passenger window of the vehicle. The owner of the pawn shop identified receipts showing that the items from Mills' house were pawned at 11:32 a.m. on the morning of the murders. David presented his driver's license to pawn a PlayStation, a pendant, and three chains. Rivers was able to identify the pawned items as belonging to his mother and Charles. The thumbprint on the pawn ticket belonged to David Frances. Rivers was also able to recognize his mother's car keys based on a small blue flashlight with her employer's logo that was on the key ring.

Id. at 809-11.

## II.    RULE 3.851 MOTION

### A. Ineffective Assistance During Guilt Phase for Failure to Object to the Striking of a Minority Venireperson

Frances asserts that his trial counsel was ineffective for failing to preserve an issue of racial bias during jury selection. Frances attempts to phrase the striking of Venireperson Roberts as a peremptory strike involving racial bias. The record indicates that the prosecutor initially sought to strike Venireperson Roberts peremptorily, and used her perceived bias as a race neutral reason for the strike.

However, the record further indicates that the judge actually struck Venireperson Roberts for cause. Therefore, it is the appropriateness of that for cause strike that is under review in this Court.

The basis of Frances' argument that trial counsel was ineffective for allowing Venireperson Roberts to be stricken is predicated on the fact that the State mischaracterized Venireperson Roberts' feelings regarding the death penalty and trial defense counsel agreed with the mischaracterization. In a postconviction context, a defendant must establish both that his or her counsel was deficient in failing to preserve the objection and that the defendant was prejudiced by counsel's lack of action. See Strickland v. Washington, 466 U.S. 668 (1984). Because the Strickland standard requires a showing of both counsel's deficient performance and prejudice to the defendant, once a reviewing court determines that the defendant has not established one prong, the court is not required to analyze whether the defendant has established the other prong. See Stewart v. State, 801 So. 2d 59, 64 (Fla. 2001) (citing Strickland, 466 U.S. at 697).

Even assuming that defense counsel was deficient for not challenging the State's mischaracterization of Venireperson Robert's position on the death penalty, Frances has failed to demonstrate that he was prejudiced by trial counsel's failure to object to the striking of Venireperson Roberts. Under the second prong of the Strickland analysis, the defendant must demonstrate a reasonable probability that

counsel's deficient performance deprived him of a fair trial, undermining the confidence in the outcome of the proceedings. Strickland, 466 U.S. at 687. In Carratelli v. State, 961 So. 2d 312 (Fla. 2007), this Court addressed the issue of whether trial counsel was ineffective for failing to object to a juror who should have been stricken for cause. In that case, we determined that in order to obtain postconviction relief, the defendant must demonstrate that an actually biased juror sat on the jury. Frances did not allege at trial, nor has he alleged in any of his appellate and postconviction documents that an actually biased juror served on the jury that convicted him. This case presents an opposite scenario, where Frances claims that his trial counsel was ineffective for allowing a juror to be stricken for cause where the juror's voir dire responses did not warrant a cause strike. Nonetheless, in that case we recognized that there is a higher standard for prejudicial reversible error in a postconviction proceeding than there would have been on direct appeal. See Caratelli, 961 So. 2d at 320 (recognizing that " 'once a conviction has been affirmed on direct appeal a presumption of finality and legality attaches to the conviction and sentence[,]' " so that on postconviction, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

Based on the clear and repeated statements of Venireperson Roberts, she did not appear to be particularly beneficial to the State, nor to Frances. The sum of her statements amounts to the assertion that she would listen to the facts and evidence presented in the case and do her best to apply the law. Therefore, there is no evidence to suggest that the removal of Venireperson Roberts from the venire resulted in prejudice to Frances. This claim is denied.

Frances further alleges that the State engaged in purposeful discrimination when it exercised a strike on Venireperson Roberts, an African American juror. A defendant has no right to a jury composed in whole or in part of jurors of his or her own race, but "[p]urposeful racial discrimination in [jury selection] violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." Batson v. Kentucky, 476 U.S. 79, 85-6 (1986). In State v. Neil, 457 So. 2d 481 (Fla. 1984) and its progeny, this Court outlined the following test to determine whether peremptory challenges are being used in a discriminatory manner: Peremptory challenges are presumed to be exercised in a nondiscriminatory manner. Neil, 475 So. 2d at 486. A party concerned about the other side's use of peremptory challenges must make a timely objection and demonstrate on the record that the challenged persons are members of a distinct racial group and may have been challenged solely because of their race. Id.; State v. Johans, 613 So. 2d 1319, 1322 (Fla. 1993). The burden then shifts to the

complained-about party to show that the questioned challenges were not exercised solely because of the prospective jurors' race. Neil, 475 So. 2d at 486-87. The reasons given in response to the court's inquiry need not be equivalent to those for a challenge for cause. Id. at 487. If the party shows that the challenges were based on characteristics of the challenged persons other than race, then the inquiry should end and jury selection should continue. Id. On the other hand, if the party has actually been challenging prospective jurors solely on the basis of race, then the court should dismiss that jury pool and start voir dire over with a new pool. Id.

The postconviction court found the State's testimony of mistake in dismissing Venireperson Roberts to be credible, and that finding is supported by competent substantial evidence. At the evidentiary hearing, the lead prosecutor testified that after reviewing a copy of the jury score sheet, it appeared that the word "opposed," which was written next to Venireperson Roberts' name, was in darker ink than the word "okay," which was also next to her name. Frances would like for this Court to infer that the "opposed" notation was made in anticipation of litigation. However, he has provided no evidence to rebut the State's testimony that this notation was written at some time during voir dire and that the striking of Venireperson Roberts was not an innocent mistake. Id. Therefore, Frances has failed to demonstrate purposeful discrimination in the striking of Venireperson Roberts.

Frances argues that the postconviction court's ruling is clearly erroneous in finding that the defense was not ineffective for striking Venireperson Roberts. The order stated:

> Based on the foregoing, the Court finds credible Ruiz's testimony that he did not remember Roberts' testimony and thus mistakenly struck her for cause based on Wixtrom's mischaracterization of her testimony. The Court also finds that there is nothing in the record indicating that Ruiz intentionally called for a false strike or that the defense team was aware of the mistake at the time it was made. Furthermore, Defendant has introduced no evidence showing that, but for Ruiz's mistake, the outcome of the trial could have been different.

The voir dire record actually indicates that it was Mr. Wixtrom, acting on behalf of the State, who moved to strike Venireperson Roberts, not Mr. Ruiz. It appears that the postconviction court was confused about who actually struck Venireperson Roberts. However, this mistake of fact does not seem to directly bear on the conclusion reached by the court that the defendant has introduced no evidence showing a reasonable probability that, but for the mistaken strike of Venireperson Roberts, the outcome of the trial would have been different. Therefore, the erroneous finding of fact was harmless. Frances has not established ineffective assistance under Strickland. Relief on this claim is denied.

## B. Ineffective Assistance During Guilt Phase for Failure to Object to Improper Comments Made by the Trial Court and the State

Comments Made by the Trial Court

For ineffective assistance of counsel claims raised in postconviction proceedings, this Court affords deference to findings of fact based on competent, substantial evidence and independently reviews deficiency and prejudice as mixed questions of law and fact subject to a de novo review standard. Ponticelli v. State, 941 So. 2d 1073, 1090 (Fla. 2006). Frances alleges that his counsel was ineffective during jury selection for failing to object to the following comments made by the Court:

> THE COURT: Thank you. Let me—before you go, let me say a word about our use of language. Oftentimes those of us who are raised in the south tend to say things delicately. It just seems to be a more courteous or a gentile way of handling things than maybe the Yanks do. So we tend to say, yes, I think I could, when what we really mean is yes.
>
> People raised in another environment might be inclined to give a more direct and positive answer. I just want to make sure the record is clear and that I understand where people stand on the issues that you are being questioned by the lawyers on these issues.
>
> Ms. Hill, if the facts warranted it and you weighed the mitigating and aggravating factors according to the instructions that I give you, could you impose the death penalty? Could you vote for the death penalty?
>
> JUROR HILL: I think it would be very difficult for me to do it.
>
> THE COURT: It's difficult for anybody. This is not an easy task for anyone involved in the room. What I'm asking for you to do is put your gentile, Southern nature aside and give us an answer about whether you could under any circumstances.

JUROR HILL: Right. If the crime—if I honestly believed the crime warranted it and I listened to all the information and I, you know, consulted with the others involved, yes.

THE COURT: Thank you, Ma'am. That's what I thought your answer was going to be.

JUROR HILL: But it would be really difficult.

THE COURT: I understand.

Mr. Combs, you were kind of on the other side, if you felt that the facts warranted it and weighed the mitigating factors on both sides, even though premeditated, could you vote for a life sentence?

JUROR COMBS: Yes.

THE COURT: Ms. Pagan, I wasn't sure about you for a while, but now I think I'm sure. I thought your answer was more direct at the end, and I'm asking for reassurance now. If you felt that the facts of the case warranted it and you weighed the factors on both sides and according to the instructions given by the court, could you under those circumstances vote for a death penalty?

JUROR PAGAN: I think so.

THE COURT: "I think so." See, it's our southern heritage.

JUROR PAGAN: I'm not—

THE COURT: We all do it. It's a hard question, no question about it.

JUROR PAGAN: It's very difficult.

THE COURT: It's a very difficult question, and I know that we're putting jurors on the spot to try to even think of issues like this. It's very difficult to do. But we would like to know if you can ever picture yourself voting for a death penalty.

- 13 -

JUROR PAGAN: Like I said, if the facts that I hear are really ugly, yes.

THE COURT: Thank you, ma'am. I thought that's what you said earlier, and that was going to be your answer but I just wanted reassurance and evidence in the record that that's what you had said.

And the others I'm not asking because I think your answers were clear on the record, so I don't mean to overlook you.

Subsequently, defense counsel raised the following objections:

MR. RUIZ: We would like to accept [the jury] subject to objections, and I would like to lay a full objection now so we don't have to do it later . . . I just have additional objections to accepting the jury and would like to renew them later.

THE COURT: Okay. What are your objections?

MR. RUIZ: Yes, your honor. Specifically, our objections, we would cite two cases. Wainwright v. Witt, 469 U.S. 412.

And we would also cite Price v. State, 538 So. 2d 486, that pertains directly to the issue of jurors that were excluded, number 35 and number 36. And our position is they were improperly excluded because they had given answers that indicated that they were willing to accept the full range of penalties, and it was after the judge questioned them that they kind of backtracked.

Our position is that based on the case law that we've cited, that was an improper exclusion. And specifically, the—on the recitation by the court to the jury was to the effect of, for lack of a better description, the polite southerner example that the court gave, and that was given on more than one occasion. The purpose was apparently so that the jurors would be more definitive in their position. The case law does not require that. Those are our objections. And we would accept the jury panel subject to those objections. But we believe that that interplay, that exchange, has affected our ability to pick jurors that should have been allowed to remain for the remaining of the jury and subject to our choosing a jury.
. . . .

- 14 -

THE COURT: It's the court's judgment to make. I think my ruling was correct, and I would overrule your objection. But it is noted and preserved for the record.

It is clear from the record that defense counsel specifically objected to the comments made by the trial judge before the jury was sworn.

Frances is claiming that his defense counsel at trial was ineffective for failing to object earlier and for failing to request a mistrial or a new jury. At the evidentiary hearing, Frances' lead counsel, Mr. Hooper, testified that he did not find the trial judge's questioning of Juror Pagan regarding her ability to vote for the death penalty to be objectionable. He insisted, "Yes, there is a problem with that response. It doesn't answer the question. It doesn't—it's not what we need. We need a yes or a no." Mr. Hooper testified that he considered Juror Pagan's response of "I think so" to be a "nonresponse." When asked whether he considered that the trial judge's comments regarding southern heritage may taint the jury, Mr. Hooper responded, "Actually, the opposite . . . the logic is that if a jury is laughing at some levity injected into the proceedings that they may be less likely to vote for death . . . so unless it's something that's offensive or prejudicial, the judge injecting some light humor like southern heritage, obviously, is positive."

The postconviction court denied the claim, finding that although "the trial court judge's comments and /or questions concerning 'Southerners' and 'Yanks' were perhaps patronizing and unrealistic, particularly in light of evolving standards

- 15 -

of jury selection . . . there is no indication in the record that the trial court judge was intentionally misleading or trying to intimidate any of the potential jurors." The postconviction court determined that "these comments and/or questions, albeit improper, do not rise to the requisite level of prejudice, wherein there is no reasonable probability that but for counsel's alleged omission, the outcome of the case would have been different." The postconviction court's findings as to the trial judge's comments are based on competent, substantial evidence in the record, and we affirm its decision on this issue.

Additionally, Frances argues that his trial counsel was ineffective for allowing two jurors to be stricken without requesting a new trial or a new jury panel. However, Frances does not demonstrate a reasonable probability that the outcome of the proceeding would have been different if his trial counsel had made the requests. At the end of voir dire, Mr. Ruiz specifically objected to the removal of these jurors, citing the court's supposed improper comments as the basis of the removal. Upon hearing the objection, the court affirmatively disagreed with the objection and overruled it. Therefore, there is no evidence that the outcome probably would have been different if Frances' defense counsel had gone further than the specific objection that was made on the record. Frances has failed to establish prejudice under Strickland.

## Comments Made by the State

Frances argues that his trial counsel was ineffective for failing to object when the State informed the jury that a list of mitigators would be provided to guide the jury's decision, which opposed the defense's strategy that a catchall mitigation instruction be provided to the jury. This Court has recognized that in evaluating a claim of deficient performance under Strickland, "[j]udicial scrutiny of counsel's performance must be highly deferential." Henry v. State, 948 So. 2d 609, 616 (Fla. 2006).

> [T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' In light of this measured deference, evidence that counsel's conduct was part of a deliberate, tactical strategy that the defendant understood and approved almost always precludes the establishment of this prong. This is especially true if the defense counsel considered and rejected alternative courses of action.

Id. at 617 (quoting Strickland, 466 U.S. at 689).

The record indicates that the prosecutor made the following statements to various voir dire panels: "The judge will give you guidelines to follow"; "The Court will give to the jury a list of factors that the jury can look at"; and "The jury will be given a framework of the law from the Court, and included in that framework will be factors that the jury can look at . . . . " Other statements made to the jury regarding aggravating and mitigating circumstances were slight variations of those listed. When questioned at the evidentiary hearing about his

failure to object to the State's comments to the jury that a list of mitigators would be provided, Mr. Hooper stated:

> I wouldn't object to that. The court or the state attorney may say the court is going to give you guidelines, which is a correct statement of the law. The court does and then what I like to hear in the jury instructions from the court is that when considering the aggravators, you must consider one, two and three . . . and implicit in that and so more in considering mitigators, you can consider any aspect, anything and everything.

The postconviction court denied this claim, in light of these comments by Frances' defense counsel. The trial court's finding that the defense counsel's failure to object was part of an overall defense strategy, that Frances cannot now be heard to complain about, is based on competent substantial evidence. Additionally, Frances failed to demonstrate that he was prejudiced as a result of the State's "promise" that a list of mitigators would be provided.

### C. Ineffective Assistance During Penalty Phase for Failing to File a Motion to Preclude the State From Seeking the Death Penalty

Frances alleges that the State used race as a basis to refuse to offer a life sentence, and that defense counsel was ineffective for failing to file a motion to prevent the state from seeking the death penalty. The postconviction court determined that the defendant failed to establish that race was ever the reason that the state sought the death penalty in this case.

For ineffective assistance of counsel claims raised in postconviction proceedings, this Court affords deference to findings of fact based on competent,

substantial evidence and independently reviews deficiency and prejudice as mixed questions of law and fact. Ponticelli, 941 So. 2d at 1090 (citing Sochor v. State, 883 So. 2d 766, 785 (Fla. 2004) (recognizing that the trial court must resolve conflicting testimony presented at the evidentiary hearing by assigning weight to each witness's testimony)).

The issues that Frances raises in relation to this claim are nearly identical to those raised in Freeman v. State, 858 So. 2d 319 (Fla. 2003). John D. Freeman was a death row inmate who appealed an order from the trial court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Id. at 321. Just as in the instant case, Freeman argued that his defense counsel was ineffective for failing to argue that the State's decision to pursue the death penalty was based on improper racial considerations. Id. at 322. This allegation was based on evidence presented at a postconviction evidentiary hearing, which revealed that Freeman's trial counsel had approached the prosecutor and offered that Freeman would plead guilty to two murders, in exchange for two consecutive life sentences with twenty-five-year mandatory minimum sentences. Id.

The evidence in Freeman further revealed that both the prosecution and the defense were aware of the then pending federal case, McClesky v. Kemp, 481 U.S. 279 (1987), which involved an allegation that prosecutors were seeking the death penalty disproportionately against African American defendants. Id. Freeman

raised a reverse-McCleskey claim, alleging that "when his trial counsel presented the plea offer to the prosecutor, the prosecutor refused the offer for fear that defense attorneys in other cases would argue that he was favoring Caucasian defendants." Id. at 322-23. Freeman also argued that his trial counsel was ineffective for failing to raise the claim because he admittedly did not know how to do so. Id. at 323.

Just as in the instant case, the prosecutor in Freeman commented on the public accusations that his office too often sought the death penalty in cases involving Caucasian victims and African American defendants. Id. at 323. Similarly, the prosecution in Freeman claimed that the news articles and public scrutiny did not affect the decision of whether or not to prosecute a case and what penalty to seek; only the facts of the case drove that determination. Id.

In Freeman, this Court recognized that "Although the decision to seek the death penalty is within the prosecutor's discretion, that discretion may be curbed by the judiciary where motives such as bad faith, race, religion, or a desire to prevent the defendant from exercising his constitutional rights contributes to the prosecutor's decision." Id. at 322 (citing State v. Bloom, 497 So. 2d 2, 3 (Fla. 1986)). This Court held that Freeman failed to establish that the State relied on race when it decided to seek the death penalty. Therefore, he could not establish that he was prejudiced under Strickland by his counsel's admitted ignorance

- 20 -

regarding the proper legal mechanism required to employ to address the issue of the prosecutor's perceived reliance on race as a factor in the decision to seek the death penalty.  Id. at 323-24.

In the instant case, conflicting testimony was presented at the evidentiary hearing regarding whether Prosecutor Sedgwick mentioned race as being the determining factor in not offering a sentence of life imprisonment to Frances. Dorothy Sedgwick recalled discussing Frances' race with his defense counsel:

> MR. HENDRY: Did race play any consideration in your decision not to offer life in the David Frances case?
>
> MS. SEDGWICK: Absolutely not.  Period.  Positively.  No question about it.
>
> MR. HENDRY: Did you say anything at all regarding race to George Couture in connection with this case?
>
> MS. SEDGWICK: I may have.
>
> MR. HENDRY: And what context might that have been?
>
> MS. SEDGWICK: I recall having conversations with several attorneys starting out with Don West.  After Don West filed a motion under McClesky versus Kemp, you know, alleging—trying to allege racial discrimination in a case in seeking the death penalty, and then when he was confronted with the case law and he had to determine whether he was going to accuse me of being racially discriminatory in the case, he withdrew it.
>
> After looking at the case law on that, I had discussions with numerous attorneys, sometimes, you know—I had discussions with probably several attorneys in cases which I may have had with George Couture in which, you know, I would have challenged him that the evidence in this case was so overwhelming, invasion was so terrible that there was

- 21 -

absolutely no reason to offer a plea of life in this case. And if—you know, I, basically, would have thought that if I did offer a plea of life in this case it would have been a matter of ridicule that we would be accused of being racially discriminatory.

MR. HENDRY: You just testified that there was absolutely no reason to offer life in this case?

MS. SEDGWICK: That's correct. That's what I remember.

In finding that the "testimony is not credible where there is nothing in the record to support the vague recollection of these witnesses," the postconviction court denied Frances claim because he "fail[ed] to establish that race was ever the reason the State sought the death penalty against him." McCleskey requires a defendant to offer "evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." 481 U.S. at 292-93.

Based on Prosecutor Sedgwick's unambiguous statement that race considerations did not play a part in her decision to seek the death penalty, coupled with her testimony regarding the aggravators in this case, the postconviction court's finding that there was not enough evidence to demonstrate whether Prosecutor Sedgwick's decision to seek the death penalty was racially motivated is supported by competent, substantial evidence. Just as the defendant in Freeman, Frances has not proven that the prosecutors in his case relied on race in deciding to seek the death penalty, only that they were aware of the accusations of racial bias surrounding the prosecutor's office.

## D. Ineffective Assistance During Penalty Phase for Failing to Investigate and Present Available Mitigation

Frances next alleges that his trial counsel was ineffective for failing to investigate and present available mitigation to the jury during the penalty phase. To be entitled to relief on this claim, Frances must show that his attorney's performance was deficient and that the deficient performance prejudiced his defense. Strickland, 466 U.S. at 687. "In the penalty phase context, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " Sochor v. State, 883 So. 2d 766, 771 (Fla. 2004) (citing Strickland, 466 U.S. at 695)). "We do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter v. McCollum, 558 U.S. 30, 44 (2009) (quoting Strickland, 466 U.S. at 693-94). When this Court reviews a circuit court's resolution of a Strickland claim, as we do here, we defer to the circuit court's factual findings, but review de novo the circuit court's legal conclusions. Id.

The postconviction court determined that Frances failed to establish that his trial counsel was deficient. After recalling the evidence presented to the jury, and the evidence presented at the evidentiary hearing, specifically that which Julie

Norman argued should have been presented to the jury, the postconviction court

denied the claim as cumulative. The court found that "the testimony presented

during the evidentiary hearing virtually added nothing new to the mitigation, but

instead essentially provided a more detailed account of the mitigation previously

presented during the penalty phase proceedings. The postconviction court also

found that counsel was entitled to rely on Frances' mental health expert,

Psychologist Eric Mings, who did not indicate that Frances needed to undergo any

additional mental health testing or evaluations.

Upon review of the record, we find that the trial court's finding that virtually

all of the evidence presented at the evidentiary hearing was a more detailed version

of the evidence presented during the penalty phase of the trial was based on

competent, substantial evidence. On direct appeal, this court summarized the

penalty phase evidence as follows:

> At the penalty phase, the State presented victim impact testimony
> from Mills' son and Charles' mother and additional testimony from
> the medical examiner about the physical effects of asphyxiation. The
> defense presented the testimony of nine witnesses: a psychotherapist
> and mitigation specialist who met and interviewed David and a
> number of people who knew him during his childhood; family
> members, friends, and former teachers and coaches; David's
> corrections officer; and Dr. Eric Mings, the psychologist who
> evaluated David's mental health status. All of the family members
> and friends testified that David was a quiet, respectful child and young
> man, but Elvis was aggressive and violent. They also testified that
> David tried to keep Elvis out of fights and trouble. Prison inmate
> Tameka Jones testified about the murder of Monique Washington in
> Tallahassee in September 2000. Jones, who had been a roommate of

the brothers in Tallahassee, went with Elvis to Washington's apartment, ostensibly to help Washington move her belongings. Instead, Elvis strangled Washington with his hands and an electric cord in order to steal her car. Jones also stated that David helped Elvis dispose of Washington's body after the fact. Dr. Mings testified that David has average intelligence and had developed a pathologically dependent relationship with Elvis at an early age.

Frances, 970 So. 2d at 811-12.

Many of the thirty-three statutory and non-statutory mitigating factors that Dr. Cunningham referenced were cumulative to the mitigation presented at trial. The record indicates that the only evidence offered in the evidentiary hearing that had not been referenced during the penalty phase is the testimony of Ms. Norman, depicting the violence that Frances witnessed in his school and neighborhood in the Virgin Islands. During the penalty phase of the trial, Julie Norman's testimony was very limited. She testified generally regarding how she obtained information, who she had interviewed and how many hours she spent investigating mitigation for Frances. The State objected to Ms. Norman testifying as to specific events that she was told occurred during the defendant's formative years, stating that this information was not the subject of any records or documentation, therefore it would have been hearsay, not subject to rebuttal by the State. The Court sustained the objection and Ms. Norman was not qualified as an expert; therefore, she was not allowed to give an opinion on the "risk factors that are normally found when . . . [defendants] are in a violent situation such as encountered here."

- 25 -

None of the witnesses who testified at the penalty phase presented evidence of the extreme violence that permeated Frances' school and neighborhood. This evidence provided a perspective of Frances' daily experiences outside of the home during adolescence. Therefore, the record does not conclusively demonstrate that the information Ms. Norman referenced in her evidentiary hearing testimony is entirely cumulative to the evidence presented at trial.

Nevertheless, a claim of ineffective assistance of counsel for failure to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented. Troy v. State, 57 So. 3d 828, 835 (Fla. 2011). Although the evidence offered by Ms. Norman at the evidentiary hearing was not exactly the same as that presented during the penalty phase, in consideration of the testimony of Dr. Cunningham, the majority of the evidence presented at the evidentiary hearing was referenced at trial.

Additionally, Frances has not established prejudice on this point because we cannot conclude that if the jury heard testimony regarding the violence that Frances witnessed in his school and neighborhood in the Virgin Islands, "there is a reasonable probability that . . . the jury . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " Sochor, 883 So. 2d at 771 (citing Strickland, 466 U.S. at 695)). The trial judge found three

aggravators in this case: (1) previous capital conviction (for the contemporaneous murders involved); (2) murder during the commission of a robbery; and (3) HAC as to the victim, Joanna Charles. Frances, 970 So. 2d at 812. As mitigating evidence, the court considered the defendant's age (twenty years old at the time of the offense), along with the evidence presented to support the non-statutory mitigating circumstances.[3] Even if the jury had heard testimony about the violence Frances witnessed as a child, we cannot conclude there is a reasonable probability that the balance of the aggravating and mitigating circumstances would have been different or that counsel's deficiencies, if any, substantially impair confidence in the outcome of the proceeding. See Lukehart v. State, 70 So. 3d 503, 504 (Fla. 2011).

## E. Cumulative Error

As discussed above, none of Frances' claims of ineffective assistance of counsel warrant relief. Accordingly, Frances' claim of cumulative error must be denied. Bradley v. State, 33 So. 3d 664, 684 (Fla. 2010).

---

3. The sentencing order notes the following nonstatutory mitigating circumstances: Frances had a kind and gentle nature as a child and teen; he has a clear sense of right and wrong; he participated as a team player in sports; he exhibited good demeanor as a model inmate; he developed a pathologically dependent relationship with Elvis from an early age which resulted in him being pulled into Elvis's lifestyle; he is polite, quiet, and reserved; he was abandoned by his mother shortly after birth and was raised in poverty by his grandmother in a small home in the Virgin Islands; and he lacked a positive male role model. See Frances, 970 So. 2d at 818 n.4.

## III. PETITION FOR HABEAS CORPUS

### A. Frances' Death Sentence is Cruel and Unusual

In his postconviction motion, Frances argued that Florida's method of execution by lethal injection violated his constitutional rights. This claim was summarily denied by the trial court. In this habeas claim, he argues that the death sentence itself is unconstitutional because it resulted from ineffective assistance of trial and appellate counsel. The purpose of a writ of habeas corpus is to inquire into the legality of a prisoner's present detention. Wright v. State, 857 So. 2d 861, 874 (Fla. 2003) (citing McCrae v. Wainwright, 439 So. 2d 868 (Fla. 1983)). Habeas corpus petitions are not to be used for additional appeals on questions which could have been or were raised on appeal or in a postconviction relief motion. Hunter v. State, 817 So. 2d 786, 798 (Fla. 2002) (citing Parker v. Dugger, 550 So. 2d 459, 460 (Fla. 1989)). Frances alleged ineffective assistance of trial counsel for failure to present available mitigation in the corresponding postconviction motion. To the extent that he raises that same claim in this petition for habeas corpus, the claim is procedurally barred and relief is denied.

Frances alleges ineffective assistance of appellate counsel, claiming that his appellate counsel failed to address the full scope of the unconstitutionality of Frances' death sentence. As support for his argument, Frances cites two United States Supreme Court decisions, Atkins v. Virginia, 536 U.S. 304 (2002) (barring

the execution of mentally retarded persons) and <u>Roper v. Simmons</u>, 543 U.S. 551 (2005) (barring the execution of juveniles) as "the evolving standards of decency" in death penalty jurisprudence. Frances contends that on direct appeal, appellate counsel never offered <u>Simmons</u> or <u>Atkins</u> as persuasive authority to show that based on evolving standards of decency, his death sentence could not be justified.

Claims of ineffective assistance of appellate counsel are appropriately raised in a petition for writ of habeas corpus. <u>Brown v. State</u>, 846 So. 2d 1114, 1127 (Fla. 2003). In order to grant habeas relief based on ineffectiveness of counsel, this Court must determine:

> [F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

<u>Pope v. Wainwright</u>, 496 So. 2d 798, 800 (Fla. 1986). It is the defendant's burden to allege a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based. <u>Brown</u>, 846 So. 2d at 1127. If a legal issue "would in all probability have been found to be without merit" had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective. <u>Rutherford v. Moore</u>, 774 So. 2d 637, 643 (Fla. 2000).

Frances argues that there was evidence to support the application of four statutory mental health mitigators in this case: (1) the crimes were committed while the defendant was under the influence of extreme mental or emotional disturbance; (2) the defendant acted under extreme duress or under the substantial dominion of another; (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (4) the age mitigator (Frances was twenty years old at the time of the crime). This Court has previously rejected defendants' attempts to extend Atkins to mental impairments that are not mental retardation. See Henyard v. State, 992 So. 2d 120 (Fla. 2008); Schoenwetter v. State, 46 So. 3d 535, 563 (Fla. 2010) ("we have held on several occasions that other mental defects are not entitled to the same consideration as mental retardation.").

Further, in finding that a death sentence for a defendant who was eighteen years and nine months old at the time of his offense was constitutional, this Court has also held that "Roper [v. Simmons] only prohibits the execution of defendants whose chronological age was below eighteen at the time of their capital offense." Id. at 561 (citing Hill v. State, 921 So. 2d 579, 584 (Fla. 2006)). As it is very likely that this Court would have found Frances' claims based on Atkins and Simmons to be without merit, appellate counsel cannot be said to be ineffective for failing to raise nonmeritorious issues.

- 30 -

**B. Appellate Counsel was Ineffective for Failure to Raise Strike of a Minority Venireperson on Direct Appeal**

Frances next argues that his appellate counsel was ineffective for failing to raise on appeal the unconstitutionality of the strike of Venireperson Roberts. The standard to prove ineffective assistance of appellate counsel is parallel to the Strickland standard for ineffective assistance of trial counsel. Rutherford, 774 So. 2d at 643. Thus, this Court's ability to grant habeas relief on the basis of appellate counsel's ineffectiveness is determined by the defendant's ability to meet both the deficiency and prejudice prongs of Strickland. Id. (stating that defendant must establish first, that appellate counsel's performance was deficient because "the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance" and second, that the petitioner was prejudiced because appellate counsel's deficiency "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.").

Because this issue was not preserved at trial, this claim was not reviewable on direct appeal unless appellate counsel could have demonstrated fundamental error. Bell v. State, 965 So. 2d 48, 76 (Fla. 2007). As this Court has explained, "to justify not imposing the contemporaneous objection rule, 'the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.' " Jackson v.

State, 983 So. 2d 562, 576 (Fla. 2008). This Court has determined that "[b]ecause . . . the failure to raise or preserve a cause challenge is not reviewable on direct appeal, it cannot constitute fundamental error per se." Carratelli, 961 So. 2d at 325. Appellate counsel could not be ineffective for failure to raise a claim that was unpreserved and did not constitute fundamental error.

## IV. CONCLUSION

For the reasons stated above, we affirm the trial court's denial of postconviction relief and we deny habeas relief.

PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., and LEWIS and CANADY, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED

Two Cases:

An Appeal from the Circuit Court in and for Orange County,
      Robert P. LeBlanc, Judge - Case No. 2000-CF-16204
And an Original Proceeding – Habeas Corpus

David Dixon Hendry, Assistant Capital Collateral Regional Counsel-Middle Region, Tampa, Florida,

      for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

      for Appellee/Respondent